ERBER & STICKLER *v.* R. G. DUN & CO.

*(Circuit Court, E. D. Arkansas.   April Term, 1882.)*

1. LIBEL—PRIVILEGED COMMUNICATIONS.
    A communication is privileged when made in good faith in answer to one having an interest in the information sought, and it will be privileged if volunteered, when the party to whom it is made has an interest in it, and such party stands in such relation to him as to make it a reasonable duty, or at least proper, that he should give the information.

2. MERCANTILE AGENCY—VERBAL STATEMENTS.
    The verbal statements of a mercantile agency, made in relation to the plaintiffs' business credit and standing as merchants, to their subscribers, who had an interest in knowing the facts, and in answer to inquiries made by them, if made in good faith and upon information on which defendant relied, are privileged, and cannot be made the foundation of an action.

3. COMMUNICATIONS—WHEN CEASE TO BE PRIVILEGED.
    A communication which would otherwise be privileged, if made with malice in fact, or through hatred, ill-will, and a malicious design to injure, is not a privileged communication, but the burden of proof is on plaintiffs to show malice in fact.

4. LIBEL—ON MERCHANTS OR BUSINESS MEN.

Every publication, in writing or in print, which charges upon or imputes to a merchant or business man insolvency or bankruptcy, or conduct which would prejudice him in his business or trade, or be injurious to his standing and credit as a merchant or business man, is a libel.

5. SAME—"DAILY NOTIFICATION SHEETS"—RESPONSIBILITY.

Where defendants, in the course of their business, issued "daily notification sheets," and sent them to all their subscribers, irrespective of their interest in the question of the plaintiffs' credit and standing, and this sheet was distributed to persons having no interest in being informed of the condition of plaintiffs' firm, this fact robs it of the protection of a privileged communication, and if it contains a libel on the plaintiffs, defendants cannot escape responsibility for such libel on the plea that it was a privileged communication to their subscribers.

6. SAME—PROVINCE OF JURY.

Where such "daily notification sheet" contained the names of the plaintiffs, and opposite thereto the words "Call at office," it rests with the jury, in view of the definition of a libel, and considering all the evidence adduced and relating to these words, to determine whether they constitute a libel on the plaintiffs in their business as merchants.

7 SAME—MEASURE OF DAMAGES—PROVINCE OF JURY.

Where a publication is libellous, the law presumes that it was made with malice—technical, legal malice, but not malice in fact—and the amount of damages depends in a large degree upon the motives which actuated defendants in its publication, and in such cases the law leaves it to the jury to find and return such damages as they think right and just, by a sound, temperate, deliberate, and reasonable exercise of their functions as jurymen.

CALDWELL, D. J., (*charging jury.*) In the year 1880, and for some years prior thereto, the plaintiffs were partners engaged in the mercantile business at Texarkana, in the state of Texas. The defendants are partners engaged in conducting a mercantile agency, having their offices or agencies in many of the principal commercial cities of the United States and Canada. It is the business of defendants to collect, through the reports of local agents and from other sources, information as to the character, credit, and pecuniary responsibility of merchants, traders, and others engaged in commercial pursuits throughout the country, and to impart the information thus acquired to their subscribers verbally, on application therefor, and by means of a "daily notification sheet" printed and sent to their subscribers at the agency issuing such sheet. There are probably other modes of conveying to their subscribers such information, but they are not material to be considered in this case. The relations existing between the defendants and their subscribers is disclosed by the contract entered into between them, a copy of which is in evidence, and by the testimony in the case. The following is a copy of the agreement signed by the subscribers to the mercantile agency:

"TERMS OF SUBSCRIPTION TO THE MERCANTILE AGENCY.

"Memorandum of the agreement between R. G. Dun & Co., proprietors of the Mercantile Agency, on the one part, and the undersigned, subscribers to said agency, on the other part, viz.:

" The said proprietors are to communicate to us, on request, for our use in our business, as an aid to us in determining the propriety of giving credit, such information as they may possess concerning the mercantile standing and credit of merchants, traders, manufacturers, etc., throughout the United States and in the dominion of Canada. It is agreed that such information has mainly been and shall mainly be obtained and communicated by servants, clerks, attorneys, and employes, appointed as our subagents in our behalf, by the said R. G. Dun & Co.; the said information to be communicated by the said R. G. Dun & Co. in accordance with the following rules and stipulations, with which we, subscribers to the agency as aforesaid, agree to comply faithfully, to-wit:

"(1) All verbal, written, or printed information communicated to us, or to such confidential clerk as may be authorized by us to receive the same, and all use of the reference book hereinafter named, and the notification sheet of corrections of said book, shall be strictly confidential, and shall never under any circumstances be communicated to the persons reported, but shall be exclusively confined to the business of our establishment.

"(2) The said R. G. Dun & Co. shall not be responsible for any loss caused by the neglect of any of the said servants, attorneys, clerks, and employes in procuring, collecting, and communicating the said information, and the actual verity or correctness of the said information is in no manner guarantied by the said R. G. Dun & Co. The action of said agency being of necessity almost entirely confidential in all of its departments and details, the said R. G. Dun & Co. shall never, under any circumstances, be required by the subscriber to disclose the name of any such servant, clerk, attorney, or employe, or any fact whatever concerning him or her, or concerning the means or sources by or from which any information so possessed or communicated was obtained.

"(3) The said R. G. Dun & Co. are hereby requested to place in our keeping, for our exclusive use, a printed copy of a reference book, containing ratings or markings of estimated capital and relative credit standing of such business men in such states as may be agreed upon, prepared by them or the servants, clerks, attorneys, and employes aforesaid, together with notification sheet of corrections. We further agree that upon the delivery to us of any subsequent edition of the reference book the one now placed in our hands shall be given up to the said R. G. Dun & Co., it being clearly understood and agreed upon that the title to said reference book is vested and remains in said R. G. Dun & Co.

"(4) We will pay in advance ——— dollars for one year's services from the date hereof of said R. G. Dun & Co., together with the use of said reference book pursuant to the foregoing conditions, and such other sum annually thereafter for the same as may be agreed upon between us, verbally or otherwise, subject always to the conditions and obligations above mentioned.

"(5) R. G. Dun & Co. are hereby permitted to reserve to themselves the right to terminate this subscription at any time on the repayment of the amount for the unexpired portion thereof.

"(6) If the inquiries for detailed reports during the year shall exceed ———— in number, the excess we agree to pay for at the rate of ———— per hundred."

The following is a copy of the ticket of inquiry signed by the subscribers to the agency when they want information in relation to those with whom they have or expect to have business relations:

"THE MERCANTILE AGENCY.

"*R. G. Dun & Co.:* Give us in confidence, and *for our exclusive use and benefit in our business, viz.*, that of aiding us to determine the propriety of giving credit, whatever information you have respecting the standing, responsibility, etc., of —

Name...... ...... ...... ........ ...  Business...... ...... ...... ......
Town. ...... ...... ......... .........  County...... ...... ...... ......
State...... ...... ...... ...... ....

............... ...... ... Subscriber.

*St. Louis,*. .... ...... ...... ....188

No...... "

And it was in answer to inquiries thus made by subscribers who had business relations with, or were creditors of, the plaintiffs that the verbal statements of the defendants in relation to the plaintiffs were made.

The plaintiffs do not contest the proposition that the business of the mercantile agency established and conducted by the defendants is, in its general features and purposes as disclosed by the evidence, both lawful and useful. It is unquestionably a lawful business, and it is now generally regarded as of utility and advantage to those engaged in conducting the business and commerce of the country.

In the fall of 1880 reports injurious to the credit and standing of the plaintiffs were in circulation in Texarkana. One of the plaintiffs tells you that these reports originated with one Kozminsky, another merchant and citizen of Texarkana. In time some statement of these reports reached the mercantile agency of the defendants at St. Louis. In what terms these reports reached the defendants' agency at St. Louis is not very clear. The plaintiffs contend the reports made by Porter, or some one else, at Texarkana, and given out by the defendants to their subscribers calling for the same, was to this effect, viz.: "Erber & Stickler are selling their goods below cost." "They are about to fail." "They have a bad business record." "Their creditors had better be on the guard and look after their claims."

Plaintiffs do not claim to have proven that defendants uttered or published all these statements to their subscribers. After critical examination of the depositions of the witnesses, in the light of the rules of evidence and the law applicable to the question, I feel justified in saying that the only sentence or clause of the alleged slanderous utterances set out in the complaint which is established by sufficient and legal evidence, or, indeed, by any evidence, is this: "Erber & Stickler are selling their goods below cost." But, in the view taken of the case by the court, it is not material to inquire whether the defendants uttered all the words alleged, or only part of them, or more. It is indisputable, under the evidence, that whatever was said orally by the defendants about the plaintiffs and their business was said in good faith and in confidence to their subscribers, who were by reason of their business relations with the plaintiffs interested in knowing their financial and business standing, and in answer to requests made by their subscribers in relation thereto, and without any malice in fact. This being so—and there is not the slightest evidence to admit of a conclusion to the contrary—the statements thus made by the defendants to their subscribers in answer to inquiries in relation to the plaintiffs are what the law terms "privileged communications." A communication is privileged when made in good faith in answer to one having an interest in the information sought; and it will be privileged if volunteered when the party to whom the communication is made has an interest in it, and the party to whom it is made stands in such a relation to him as to make it a reasonable duty, or at least proper that he should give the information.

Accordingly, the verbal statements which the defendants made in relation to the plaintiffs' business credit and standing as merchants, to their subscribers who had an interest in knowing the facts, and in answer to inquiries made by them, having been made in good faith and upon information on which defendants relied, are privileged, and cannot be made the foundation of an action. But a communication which would otherwise be privileged is not so if made with *malice in fact*—that is, through hatred, ill-will, and a malicious desire to injure; and a statement privileged in the first instance may lose its privileged character by being repeated and persisted in after knowledge of the fact that it is false or erroneous has been brought home to its author.

It is not contended that the defendants were actuated by actual malice in first making the statements in relation to the plaintiffs. But the learned counsel for the plaintiffs insist that there is some

evidence, enough to make it the duty of the court to submit the question to the jury, that the defendants repeated and gave out the statements in relation to the plaintiffs after they had been informed of their false and erroneous character.

The burden of proof to show malice in fact is on the plaintiffs, and it should be reasonably clear and satisfactory. Malice in fact is never presumed: it is a fact to be proven; and if there is either no proof, or the proof is insufficient to warrant a verdict, it is the duty of the court to take the question from the jury. There is no evidence of malice in fact, and inasmuch as a verdict for the plaintiffs, based on the idea that the defendants were guilty of actual malice, would have to be set aside for want of evidence to support it, the jury are instructed to find for the defendants on all the paragraphs of the complaint based on oral statements of defendants to their subscribers made under the circumstances indicated. This disposes of the causes of action set out in all the paragraphs of the plaintiffs' complaint except the sixth. The issue on this paragraph is the only one left for you to consider. That paragraph is based on the publication by the defendants on the thirteenth day of December, 1880, of what is known as the "daily notification sheet," on which appeared the name of the plaintiffs' firm and residence with the words, "Call at office," opposite thereto. These "daily notification sheets" were sent out by the defendants to all their subscribers in the city of St. Louis, numbering 600, irrespective of their interest in the question of the plaintiffs' credit and standing. *This sheet was distributed to persons. having no interest in being informed of the condition of plaintiffs' firm.* This fact robs it of the protection of a privileged communication, and if it contains a libel on the plaintiffs the defendants cannot escape responsibility for such libel on the plea that it was a privileged communication to their subscribers.

"At the present day the law in relation to libel is that the judge is not bound to state to the jury as a matter of law whether the publication complained of and sued for is a libel or not; but the proper course is for him to define what is a libel in point of law, and leave it to the jury whether the publication falls within that definition, and, as incidental to that, whether it is calculated to injure the reputation of the plaintiffs." 2 Greenl. Ev. § 411; *McDonald* v. *Woodruff,* 2 Dill. 244. Accordingly, it becomes the duty of the court to define in law what is a libel. *Every publication in writing or in print which charges upon or imputes to a merchant or business man insolvency or bankruptcy, or conduct which would prejudice him in his business or*

*trade, or be injurious to his standing and credit as a merchant or business man, is a libel.*

It is your duty to determine whether the publication of the "daily notification sheet," containing the names of the plaintiffs, and opposite thereto the words "Call at office," is a libel on the plaintiffs within this definition. Obviously these words taken by themselves, disconnected from everything else, do not import a libellous charge. But the plaintiffs claim that these words, in the connection in which they are used in this "daily notification sheet," have a fixed and settled meaning, well understood by the defendants and their subscribers, to whom the sheet was distributed, and that in substance and effect the meaning is that the defendants have information in relation to the parties named and their business damaging in its character, or well calculated to affect injuriously their credit, which information will be imparted to subscribers interested on request. The defendants deny that these words as used by them import any such meaning, or that they intend them to have any such meaning, or that they are susceptible of any such construction. Mr. Scranton, the manager of the defendants' agency at St. Louis, says that the words "Call at office," on the daily change sheet, "mean that we have in our possession information that may be beneficial to the subscribers with whom such trader deals," and that information may be beneficial to subscribers, or of interest to them, that is in no manner discrediting to the parties named, or calculated to affect injuriously their credit.

Keeping in view the definition of a libel which I have given you, and considering all the evidence relating to these words, as used by the defendants in their publication, it rests with you to say whether they constitute a libel on the plaintiffs in their business as merchants. If you believe from the evidence that the publication of plaintiff's firm name in the manner stated was intended by the defendants to convey to their subscribers the statement, in substance or effect, that the defendants were in possession of information damaging to the credit and commercial standing of plaintiffs as merchants, and that such was the meaning attached, and intended to be attached, to these words by their subscribers, to whom the publication was sent, then the publication was equally significant and injurious, and equally libellous, as if made in the distinct terms of such understanding on the face of the paper, and the plaintiffs are entitled to a verdict. It is not sufficient that one or more of the defendants' subscribers attached such injurious meaning to these words. It must appear either

that such is the fair meaning or effect of the words in the connection in which they are used, or that such is the meaning attached to them by the defendants, and is the sense in which they intend their subscribers shall understand them, and that their subscribers, or some of them, or other persons, do attach such meaning to them.

If you find the publication referred to is libellous under the foregoing instructions, you will then have occasion to consider the question of damages. If the publication was libellous, then the law presumes it was made with malice, but the malice which the law affixes to a libellous publication is a technical, legal malice, and not malice in fact.

*Malice in fact* must be proven as any other fact. The law does not presume it, and the jury cannot infer it without evidence to warrant such inference.

The amount of damages depends in a large degree upon the motives which actuated the defendants in making the publication, and the circumstances under which it was made, all of which you will take into consideration, if your finding makes it necessary to consider the question of damages.

"The law leaves the amount of the damages in such cases to the sound judgment of the jury, reasonably, fairly, and dispassionately exercised. This it does from necessity. If one man owes another so many dollars, or has taken from him so much property, or has broken a specific contract, there is something to *measure* (as the law terms it) *the amount of the damages or the recovery.* But in an action of this kind the law is unable to furnish you with any definite rule to measure the damages. It confides it to the sound, temperate, deliberate, and reasonable exercise of your functions as jurymen. The law leaves the jury at liberty to find and return such damages as they think right and just; but this is not a wild, unrestrained, communal liberty, to be arbitrarily exercised, but the higher and better kind of liberty, viz., liberty restrained by reason and moderated by justice." *McDonald* v. *Woodruff,* 2 Dill. 248.

---

Opinion of the court delivered after argument upon prayers for instructions:

CALDWELL, D. J., *(orally.)* The first instruction asked for by the plaintiffs is as follows:

"The jury are instructed that the business of the mercantile agency established and conducted by the defendants, R. G. Dun & Co., is, in its general features and purposes, as disclosed by the evidence, both lawful and useful, and information, however defamatory, communicated by such agency in good faith, and believing it to be true, through the defendants, R. G. Dun & Co., personally, to merchants personally, and applying therefor to guide them in their business, is in law a privileged communication, for which no action can be maintained by the parties defamed except on proof of express malice; and if the defendants, R. G. Dun & Co., had only communicated by themselves personally, to such of their subscribers as personally made inquiries concerning the standing and credit of the plaintiffs, the reports complained of, the case would have come within the rule of law as to privileged communications. * * * No person other than the merchant *himself*, asking for information, has in law a right to read, hear, or receive said words, and to him they can be lawfully communicated only by the defendants, R. G. Dun & Co. *personally;* and the reading of said words by any person in their employ by their permission, or the delivery of a written or printed statement containing said words by their employes, with their permission, to the clerks of a merchant subscriber requesting information concerning the plaintiffs, or to such subscribers, was an unlawful publication, not at all within or protected by the rule of law as to privileged communications."

The instruction as asked concedes too much to the defendants, or not enough. If such communications are privileged when made to one or all the members of a mercantile firm, it is not perceived why they are not equally so when made to an agent of such firm authorized to receive them for the firm, or for his own guidance in the conduct of the business of the firm confided to his charge. If such communications made to an agent under such circumstances are not privileged, no more are they when made to a principal. Courts should not close their eyes to the necessary and uniform method of conducting business among merchants and other business men and corporations, and no rule should be adopted that will render impracticable resort to these necessary and convenient methods in any particular instance, or branch of their business, unless some principle imperatively demands it, or it can be shown some good results will flow from it; results actually different and better than obtain under existing methods.

The merchants and other business men of the country conduct their business to a very large extent through agents. A large proportion, if not all, of the principal commercial houses of the country employ commercial travelers, through whom sales are effected, credit extended, and collections made. In many of the houses there is what is usually termed the "credit man" of the house, whose special busi-

ness it is to inquire in reference to the merit of all persons applying to purchase on credit, and who determines to whom credit shall be given, and the amount. The credit man of a house may or may not be a principal. It frequently occurs that he is a mere clerk or agent. Can it be sound law that a communication made to a principal in a house, to be by him immediately communicated to an agent of the house who conducts and controls the business to which such communication relates, is privileged, and that the same communication made directly to such agent is not privileged?

It is also said that while such information is privileged if imparted by some member of the firm of Dun & Co., it is not so if imparted by a clerk or agent of theirs.

If the business of the defendants is lawful, then it may be conducted by the same agencies that are lawful in the conduct of any other business.

The distinction attempted to be drawn between the right to resort to the services of an agent in this business, and other legitimate business pursuits, is not well founded. It is not in harmony with the known and universal methods of conducting business. Commercial and other business pursuits are conducted chiefly by partnerships and corporations, and the former often, and the latter always, can act only by agents; and any rule of law that would deny to them the right to avail themselves of the services of an agent in every department of their business, and for every legitimate purpose connected with it, is unsound. What a man may lawfully do by himself he may do by an agent. The distinction taken between a communication to the principal and his agent in the case of *Beardsley* v. *Tappan*, 5 Blatchf. 497, is too refined. It is not supported by reason or authority.

Whether the information is given to the agent or his principal, it is in the end communicated to the person, be he agent or principal, for whose guidance it is intended.

The real question is whether such communications made by a commercial agency like that conducted by the defendants are privileged in any case. The communications in this case were made orally, and in confidence and in good faith, by the defendants or their clerks, in answer to inquiries from subscribers who were creditors of plaintiffs, and therefore had an interest in knowing their standing and pecuniary condition as merchants. The relation existing between defendants and their subscribers is disclosed by a written contract signed by the subscribers. [For copy of this contract see charge of the court to the jury.] It is insisted the effect of this argument is to make the

defendants the agents of their subscribers, and that the privilege that attaches to communications between principal and agent obtain for their protection.

It is questionable whether it is not pushing the doctrine of privileged communications beyond its legitimate scope to hold that a corporation or partnership whose business it is to collect information in regard to the standing and financial condition of business men, which is imparted to subscribers for a money consideration, can invoke the doctrine of privileged communication for its protection. That verbal information given in good faith and confidentially by the principal in such an agency, to merchants who have an interest in knowing the condition of the person inquired about, is privileged, was decided in *Beardsley* v. *Tappan, supra.*

While the distinction taken in that case between such communications made to a principal and to his agent is not regarded as sound, it is authority to the point that between principal and principal such communications are privileged. The only case on this point decided by a court of last resort, brought to our attention, is *Ormsby* v. *Douglass,* 37 N. Y. 477. That case is on all-fours with the case at bar, and, in the absence of opposing authority on the question, we incline to assent to its reasoning and to follow it. In the opinion of the court in that case, delivered by Mr. Justice Woodruff, it is said:

"It is a general rule that confidential communications respecting the character of another, made to one who is interested in the communication and desires information as a guide to himself in the conduct of his own affairs and dealings with each other, are privileged and not actionable. Starkie, Slander, 321; *Bradley* v. *Heath,* 12 Pick. 163, and cases cited; 3 B. & P. 587; 9 B. & C. 403."

Again:

"Upon the same general principle merchants have an interest in knowing, and have a right to know, the character of their dealers and those who propose to deal with them, and of those upon whose standing and responsibility they, in the course of their business, have occasion to rely.

"As a necessary consequence, they may make inquiries of other merchants, or of any person who may have information; and if such merchant or other person, in good faith, communicates the information which he has, or thinks he has, the communication is privileged."

Again:

"Information of the description referred to being important, there is no legal objection to the employment of an agent to seek and communicate it; and the agent may properly be paid for his time, labor, and expense in the pursuit of such information.

" If one merchant may employ his own private agent to seek and communi-cate such information, (3 Denio, 110,) there is no legal objection to the com-bination or union of two or more in the employment of the same agent. And, as a consequence, if an agent may act for several, he may make the pursuit of such information his occupation, and receive from those who desire to avail themselves of his services and his knowledge acquired in such occupation a compensation therefor.

" In short, the inquiry is not, how did the defendant acquire the informa-tion, nor whether he received compensation for the information he had gained, but was the occasion one which justified him in giving such information as he possessed to the applicant."

It is worthy of remark that the author of this opinion was after-wards United States circuit judge for the second circuit, and Justice Hunt, of the supreme court of the United States, was also a member of the court of appeals at the time the case was decided, and seems to have concurred in the opinion.

The case of *Sunderlin* v. *Bradstreet*, 46 N. Y. 188, does not over-rule or conflict with *Ormsby* v. *Douglass.* The question in the two cases was not the same.

The sixth paragraph of the complaint in this case raises the pre-cise question decided in *Sunderlin* v. *Bradstreet.* That paragraph is as follows:

" That said R. G. Dun & Co. publish and issue daily, in their business, unto upwards of 10,000 persons or business firms in the United States and domin-ion of Canada a certain publication termed a 'daily notification sheet,' in which they purport to give the names of all persons or business firms in the United States of and concerning whom they have information of insolvency, bankruptcy, or approaching or impending insolvency or bankruptcy, or of such damaging character as to honesty, integrity, and financial worth as to give it to be understood that they are no longer worthy of credit, and against whom creditors of such persons or business firms had better take immediate proceedings to secure or collect their claims; that whenever said R. G. Dun & Co. desire to give said defamatory matter to be understood by merchants they publish and print the name of such person or business firm of and concerning whom such defamatory matter is intended to be conveyed in said 'daily notifi-cation sheet,' with the words 'Call at office' opposite the same.

"And plaintiffs allege and say that with the intent to give it to be under-stood of and concerning the plaintiffs that they were dishonest, were about to become insolvent and bankrupt, and defraud their creditors, and that their creditors had better proceed against them to secure or collect their respective claims and demands, and that plaintiffs no longer were entitled to or worthy of any credit, they, the said R. G. Dun & Co., did, on or about the thirteenth day of December last past, and on divers other days since, publish and print the plaintiff's firm name on the said 'daily notification sheet,' with the words

opposite thereto of 'Call at office,' which meaning, as aforesaid, was well understood by all to whom said sheet was delivered, being about 10,000 merchants or business firms in the United States."

This daily notification sheet was sent to all the subscribers to the agency in St. Louis, without regard to the question whether they had any interest in the defendants or their business. As a matter of fact not 1 per cent. of the subscribers to whom it was sent had such interest. It is too clear for argument that if this sheet contains a libel on the plaintiffs the defendants cannot avail themselves of the plea that it was a privileged communication. Whether there is anything in it that constitutes a libel on the plaintiffs will be left for the jury to determine under appropriate instructions.

Judge Cooley, in his treatise on the Law of Torts, p. 217, says: "But if one makes it his business to furnish to others information concerning the character, habits, standing, and responsibility of tradesmen, his business is not privileged and he must justify his reports by the truth." The cases cited do not support the broad language of the text. If the information referred to is given out publicly, or in written or printed sheets sent to subscribers generally, without regard to their interest in the parties named therein, it is not privileged, (*Sunderlin* v. *Bradstreet, supra;*) but if it is given confidentially and in good faith, on request of subscribers having an interest in the person and his business to whom the inquiry relates, it is privileged, (*Beardsley* v. *Tappan*, 5 Blatch. 497; *Ormsby* v. *Douglass*, 37 N. Y. 477.) The learned author doubtless had reference to information conveyed in the mode first stated, or in some general and public manner, and not to oral and confidential communications made in answer to inquiries from subscribers directly interested.