Dun & Bradstreet, Inc. *v.* Robinson.

5-2236                                            345 S. W. 2d 34

Opinion delivered February 27, 1961.

[Rehearing denied, opinion amended May 1, 1961.]

*Rex W. Perkins, Wade & McAllister, Mehaffy, Smith & Williams, John T. Williams, Robert V. Light,* for appellant.

*Crouch, Jones, Blair* and *Cypert,* by *James B. Blair,* for appellee.

CARLETON HARRIS, Chief Justice. This is a libel suit. Appellee, Joe Robinson, is engaged in the wholesale produce business in Springdale, Arkansas. Appellant, Dun

& Bradstreet, Inc., is a mercantile agency, engaged in the business of gathering, compiling, and furnishing to its subscribers information concerning the credit and financial standing of individuals and organizations. Appellant, Mrs. Margaret Lawrence, was the Dun & Bradstreet correspondent in the Springdale area. Mrs. Lawrence was given employment by the company in February, 1958, and on February 27th, according to her testimony, during the course of taking a report from John Holyfield of Horner Tire Company of Springdale, appellant was asked by the latter if she had heard that Joe Robinson had taken bankruptcy.[1] Mrs. Lawrence had not heard the report, but, according to the witness, in compliance with instructions from Dun & Bradstreet to report to the Little Rock office any unusual occurrences, she left Holyfield's office, went home, and immediately called the Dun & Bradstreet office in Little Rock, and related what Mr. Holyfield had said. The Little Rock office prepared the following "special notice report", which was sent, on March 3rd, to thirty-six of its subscribers.

"         5141
ROBINSON, JOE

SN 85 MARCH 3 1958
WHOLESALE PRODUCE

SPRINGDALE ARK
WASHINGTON COUNTY
HWY NO. 71 SOUTH OR
1020 & 1102 N/SE SOUTH

RATING: (Investigating) C 2 1/2

BUSINESS REPORTED DISCONTINUED

It is currently reported subject discontinued operations February 26, 1958. Further investigation is underway for more complete details.

3-358 (066c-9)"

---

[1] According to the testimony of Holyfield, he asked Mrs. Lawrence "if there was anything to the rumor I had heard that Mr. Robinson was going out of business."

In the meantime, Mrs. Lawrence, on February 28th, (the day following her initial report) received a request from the Little Rock office asking for further information in the nature of a report form to be filled in on Robinson. Mrs. Lawrence called Robinson's office, and talked with his secretary, who denied the report. Subsequently, Robinson called this appellant, and told her that the report was not true. Mrs. Lawrence wrote up the report on that date, but was unable to state when it was mailed. The company apparently received it on March 4th, and as a result, sent out the following notice to the same customers.

"          5141
ROBINSON, JOE

SN 85 MARCH 4 1958
WHOL PRODUCE

SPRINGDALE ARK
WASHINGTON COUNTY
HWY NO. 71 SOUTH OR
1020 & 1102 N/SE SOUTH

RATING: C 2 1/2

BUSINESS CONTINUED

Joe Robinson was interviewed recently and he denied reports that operation discontinued, or that he has sustained any business reverses.

3-4-58 (066c-51)"

On March 15, 1958, appellee instituted suit against Dun & Bradstreet and Mrs. Lawrence seeking recovery of $750,000 for damages sustained as a result of the publication of the notices. The complaint alleged the published notices to be false and untrue, and asserted that the publications had caused Robinson's customers and potential customers to believe that his business had failed or was about to fail. The notices were alleged to have been published with malicious intent to injure Robinson in his business, and appellee asserted that such business had been greatly injured, in that he had suffered a great loss of

customers and income, and would in the future so suffer; that his credit had been curtailed, and his reputation injured, as a result of the publication of the reports, and that he had suffered extreme personal embarrassment. After the filing of demurrers, which were overruled, appellants filed their separate answers, Mrs. Lawrence asserting that her communication to the company was made in good faith, under circumstances of reasonable caution as to its being confidential, and that the communications were privileged. She further asserted that the communication was true. Dun & Bradstreet alleged that the information was received from sources reasonably believed by it to be reliable; that the reports were sent only to subscribers as had theretofore requested information pertaining to appellee, and that the report was qualifiedly privileged. Further answering, the appellant company alleged its good faith and denied that the information was furnished maliciously. On trial, the jury returned a verdict for Robinson against the appellants in the amount of $30,000 for special compensatory damages, $10,000 being awarded for damages already suffered, and $20,000 awarded for future damages. The jury did not award punitive damages as sought by appellee. From the judgment entered in compliance with the jury verdict, appellants bring this appeal.[2] For reversal, appellants principally rely upon three contentions, viz, "(1) That the truth of the publications was established by the undisputed proof, (2) That there is no competent evidence in the record to support a finding of malice necessary to destroy the qualified privilege that protects the defendants from liability, and (3) That there is no substantial evidence in the record to support a finding of either the fact or amount of damages accruing to the plaintiff as a proximate result of the publications." We proceed to a discussion of each contention in the order listed.

Appellants emphasize that Dun & Bradstreet did not report that Joe Robinson had discontinued business operations, but rather, the report stated "*it is currently re-*

---

[2] Appellee also originally cross-appealed, but the cross-appeal has been abandoned.

*ported*" that Robinson had discontinued operations. In other words, appellants contend that since such a report actually had been received, the publication was entirely true, and such truth is a complete defense. We very quickly reject this argument as unsound. While it has been generally held that the truth of a defamatory statement is a complete defense to an action for libel,[3] the "truth" referred to has reference to the correctness of the substance of the report, rather than the fact that such a report was made. In Restatement of the Law of Torts, Vol. 3, A.L.I., § 582, subsection (d), p. 217, we find:

"d. It is necessary to establish the truth of the defamatory matter contained in the statement. When one person repeats a defamatory statement which he attributes to some other person, it is not enough for the person who repeats it to prove that the statement was made by the other person. He must prove the truth of the defamatory charges which he has thus repeated."

Obviously, plain logic supports the propriety of this rule. We think the words used in the report of March 3rd clearly, in their common acceptation, convey to the reader that appellee had discontinued operations, even to specifically giving the date of discontinuance, February 26th, 1958. The second sentence of the report read, "Further investigation is underway for more complete details." More complete details on what? In our opinion, this language would be unquestionably construed by a subscriber to refer, not to whether operations had been discontinued, but rather, to the details of the circumstances leading to dis-

[3] According to Restatement of the Law of Torts, this rule has been modified either by constitutional or statutory enactment in a number of states. In several, the truth is by statute of a defense in a civil action unless it is published from "malicious motives". In others, in addition to good motives, statutes require that the defamatory matter be published for "justifiable ends." In still others, the publication must be made for the "public information" or in connection with a matter which is the "subject of public concern." In our own case of *Roberts* v. *Love*, 231 Ark. 886, 333 S. W. 2d 897, we said: "Likewise, though the factual report appearing in the article was admittedly true (except that appellant alleged the term 'legal technicality' to be false), our conclusions are not based upon that premise, for we do not say unequivocally or dogmatically that one can never be libeled by a statement, even though true."

continuance. Since admittedly, Robinson had not ceased operations, the report sent out by Dun & Bradstreet was erroneous, and appellants have no valid defense in asserting the truth of the communication.

It is not really argued that the second communication was a correction or retraction of the first,[4] nor would such argument be valid. It will be noted that the March 4th report does not state that the earlier notice was in error, and that the subject has not discontinued operations; rather, it states that Robinson "denied reports operation discontinued." This, of course, is not to say that the original notice was erroneous, and the second communication would carry but little weight in changing the opinion of those who received the first publication. A person charged with crime generally denies that he has committed the crime, but this does not vindicate him in the eyes of the public. To illustrate, suppose a notice is published, "It is currently reported John Smith has stolen money from his employer." Subsequently, a notice is published, "John Smith denies that he stole money from his employer." No one could reasonably argue that the latter statement was a retraction of the first. At any rate, of course, even though the second Dun & Bradstreet notice could possibly be considered as a full and fair correction or retraction, same could only be considered in mitigation of damages. See 53 C.J.S., § 257, p. 371.

It might be well to here state that counsel for appellants and appellee, during oral argument, clearly stated to the Court, and agreed, that neither side desired the case to be remanded for another trial, i.e., appellants' argument was directed solely to the fact that the judgment should be reversed and dismissed, and appellee's argument (his cross-appeal having been abandoned) was directed to support of the judgment awarded.

---

[4] Actually, Robinson contended this communication was also libelous in that he testified he did not tell Mrs. Lawrence he had suffered no business reverses. Apparently, appellee's theory is that creditors knew that he had suffered some losses, and that a denial by him would only strengthen their belief that the original notice was correct.

Of all the instructions given (10), appellants now only complain of the definition of malice given by the court, found in Instruction No. 2. That definition is as follows:

"Malice is defined as the doing of a wrongful act, either in a personal sense, as the doing of an act intentionally that is wrong, or the doing of an act actuated by spite, grudge, hatred, ill will or evil intent, or in the impersonal sense, as the doing of an act without just cause or excuse, with such a conscious indifference or reckless disregard as to its results or effects upon the rights or feelings of others as to constitute ill will."

Appellants contend that the communications were made upon conditionally privileged occasions, and that to overcome this conditional privilege, appellee must show actual malice, *i.e.*, ill will, spite, or grudge, which actuated the publications. In other words, appellants, by the term "actual malice," mean malice in the moral sense—sometimes legally termed "malice in fact"—the feeling of hate —vindictiveness—animosity—which prompts one to say or write unkind things about another in the spirit of revenge, or other malevolent motive. We agree with appellants, and with the trial court, that the publications were made upon conditionally privileged occasions, and the jury was so instructed. Though there are a few decisions to the contrary, the rule supported by the weight of authority is that the defense of qualified privilege is available to a mercantile agency relative to reports referring to credit or financial standing and furnished subscribers having an interest in the matter. See 53 C.J.S., § 119, p. 196. The reason for such a rule is well expressed in Restatement of the Law of Torts, Vol. 3, A.L.I., p. 240:

"Occasions conditionally privileged afford a protection based upon a public policy which recognizes that it is essential that true information shall be given whenever it is reasonably necessary for the protection of one's own interests, the interests of third persons, or certain interests of the public. In order that such information may be freely given, it is necessary to afford protection against

liability for misinformation given in an honest and reasonable effort to protect or advance the interest in question. Were such protection not given, true information which should be given or received would not be communicated through fear of the persons capable of giving it that they would be held liable in an action of defamation unless they could meet the heavy burden of satisfying a jury that their statements were true. These privileges have a strong analogy to the privileges intentionally to invade the legally protected interests in bodily security, freedom from confinement and the exclusive possession of land or chattels. Like these privileges, they give protection from liability only when exercised for the purpose for which they are given and with reasonable care that no more harm shall be done to the interests of others than is necessary to accomplish the end for which the privilege is given.''

However, we hold the second part of appellants' contention, *viz.,* that malice in the moral sense must be shown to overcome this privilege, to be unsound, as well as against the great weight of authority. In taking this view, we are not unmindful of the cases cited by appellants to the contrary.[5] But even though these cases expressed the majority, rather than the minority view, we would be reluctant to adopt the same reasoning, for we think such a holding gives undue protection to a mercantile agency, while placing an undue burden upon the individual or concern which has borne the brunt of untrue and damaging statements. Rather, we think appellants are liable under the definition of malice given by the trial court. Actually, there is authority to the effect that a plaintiff need not make even as strong a showing as was required by that instruction; that false information conveyed because of negligent investigation is sufficient to destroy the qualified privilege. This need not be considered in the instant case, since we think the proof, hereinafter discussed, was sufficient under either concept. In *ABC Needlecraft Co.*

---

[5] *Erbert & Stickler* v. *R. G. Dunn & Co.*, 12 F. 526 (this case was decided in 1882.) *Cullum* v. *Dun & Bradstreet, Inc.*, 228 S. C. 384, 90 S. E. 2d 370. *Johns* v. *Associated Aviation Underwriters*, 203 F. 2d 208.

v. *Dun & Bradstreet, Inc.*, 245 F. 2d 775, it was held that the malice necessary to destroy a qualified privilege can, in addition to actual malice, consist of such reckless disregard of the rights of another as to constitute the equivalent of ill will. The Court commented:

"With nothing more to go on than a misunderstood casual remark, with no effort to verify the facts, though to have done so would have been a simple matter, the defendant published information of a serious and damaging nature."

The court held that whether the proof showed "constructive malice" was a question of fact to be submitted to the jury. This is in line with our own case of *Thiel* v. *Dove*, 229 Ark. 601, 317 S. W. 2d 121, wherein this Court said:

"It may be conceded that if Thiel did not know who lived in the apartment next to the stairway his statements were not consciously motivated by ill will toward Mrs. Dove in particular. But the proof supports a finding that Thiel acted at his peril in designating the apartment and displayed such a conscious indifference to results that his conduct could be regarded as willfully wrong."

Dun & Bradstreet enjoys the implicit confidence of its subscribers, as attested by witnesses in the cause before us. This confidence in the accuracy of Dun & Bradstreet reports places an even greater responsibility upon the company, and requires "that its reports be compiled with regard to the effect that such report may have upon the rights or feelings of the person reported on, if it should develop that the information given is false." In applying "the law given by the court in its instruction heretofore quoted," we look to the evidence to determine "whether a jury question was presented." Clearly, we think the answer is, "Yes." It would have been an easy matter for Mrs. Lawrence to have called Robinson on February 27th before communicating the rumor to the Dun & Bradstreet offices in Little Rock; in fact, Mrs. Lawrence did call Robinson's office the next day. Likewise, though the Little Rock office asked Mrs. Lawrence on February 28th for additional information, the special

report to subscribers was mailed out from Little Rock before receiving Mrs. Lawrence's response to this request; at that, it was not sent until Monday, March 3rd, four days after receiving her telephone call. This four day period between the receipt and dissemination of this information certainly indicates that the company did not consider the report so startling and important that there was a pressing need for immediate communication to subscribers, and it seems that prudence would have dictated that the company await further clarification, particularly since the information was obtained from an inexperienced operator. By waiting one more day, the company would not have found it necessary to send out the second report. We hold there was substantial evidence to the effect that Mrs. Lawrence and Dun & Bradstreet acted with conscious indifference and reckless disregard of the rights of Robinson in publishing the report of March 3rd; it follows that the protection afforded by the fact that the communication was conditionally privileged, was lost.

We come now to the question of damages. Though quite a bit of evidence was offered on behalf of appellee as to loss of business from people who were not subscribers to the reporting service of Dun & Bradstreet, and who had allegedly ceased or curtailed business with Robinson because of hearing of the report to the subscribers, the trial court instructed the jury not to consider any unauthorized republication in determining special compensatory damages. We see no need to discuss the issue of republication, *i.e.*, when one may be liable for unauthorized republication of defamatory statements, since the instruction was favorable to the appellants, and appellee has made no complaint, and further, since we take the view that the evidence reflects a sufficient loss of customers and loss of credit from Dun & Bradstreet subscribers to justify the amount awarded. We do agree with appellants (and the trial court so ruled) that the publication of March 3d was not libelous *per se,* but rather was actionable *per quod.* As stated in 53 C.J.S., § 8, p. 41:

"In general, defamatory words may be divided into those that are actionable *per se,* which on their face and

without the aid of extrinsic proof are recognized as injurious, and those that are actionable *per quod,* as to which the injurious character appears only in consequence of extrinsic facts.''

Of course, words that are actionable *per se* support a recovery of general damages, while words actionable *per quod* only support special damages. The court properly instructed the jury in this respect.

H. E. Schmieding, engaged in the produce business, a partner in H. E. Schmieding Produce Company, president of Schmieding Brothers, Inc., and a stockholder in Schmieding Brothers, Inc., of Colorado, testified that all these businesses ''are worked together.'' The companies are engaged in buying and selling fruit and vegetables. The witness testified that he had been engaged in business in Springdale twenty-two years, and that he received the two notices from Dun & Bradstreet on March 4th and 5th, 1958.[6] He stated that his companies had been doing business with Robinson prior to March 3d, 1958, in that Robinson has been hauling loads for him. Schmieding testified, ''When we receive a notice from Dun & Bradstreet, we more or less follow their line, as far as our operation is concerned. That is the reason we have their reports and why we are on the mailing list, and we go according to what they say. We figure they are a very reliable source of information.'' He stated that while the company actually paid nearly $3000 more to Robinson from March, 1958, to March, 1959, than in the preceding year, the loads given to appellee were cheaper, and loads of less profit. The witness testified that previously Robinson had hauled loads of eggs and peaches, and that perishable loads are more profitable; that following receipt of the reports, Robinson was given loads of sweet potatoes and Irish potatoes, but no perishable products. The witness stated that ''The reason why we didn't give him the egg loads and peach loads is that there was a definite

---

[6] Schmieding, when asked which notice he received the first day, replied, "The one where he had discontinued operations." The court sustained an objection to this answer, but it is interesting, with reference to our discussion of point one, to note the interpretation placed on the notice received, by the subscriber.

question in our mind as to his operation after we received the reports.'' Schmieding stated that he was not familiar with any rumors concerning Robinson at the time of receiving the reports.

T. G. Hill & Company of Atlanta, Georgia, was sent the notices issued by Dun & Bradstreet. Robinson testified that prior to March 3, 1958, he bought quite a lot of soy bean meal and cotton seed meal from that company. ''If they had someone that wanted to buy in Florida, for instance, they funneled the business into our office.'' The witness testified that his gross volume business with the Hill company during the year 1957 and up until March 3, 1958, was $30,860.42. He further testified that he could find no record of any business with that organization since the latter date. No explanation was offered for this loss of business, as no official of the company testified. Robinson testified that in 1957, he had a gross volume of business with Cook & Company of Atlanta, Georgia, in the amount of $3,500, but nothing after March 3, 1958. No official of this company testified as to the reason for discontinuing business with Robinson. Appellee testified relative to a decrease in volume of business from several companies after March 3, 1958, among them Sunkist Growers of Ontario, California, for whom he had transported oranges and lemons; Okoma Frozen Foods of Omaha, Nebraska, for whom he had transported frozen poultry and turkeys, and Fairmont Foods of Omaha, for whom he had also previously hauled frozen turkeys and poultry, but not after March 3, 1958. Fred Hoeffner, credit manager of Okoma, by deposition testified that the company had not at any time had business transactions with Robinson; that his attitude concerning the credit standing of Robinson did not change in any way after receiving these special reports (why the special notice reports were sent to a company that had no business transactions with Robinson is not made clear). John P. Macnamara, general credit manager of Fairmont Foods Company, testified that the credit reports had nothing to do with the drop in business to Robinson, but that the company had changed its method of operations.

Appellee testified quite at length relative to special damages suffered due to loss of credit following the publication of the notices. According to the witness, on March 3, 1958, he was indebted to Diamond-T Motor Company of Chicago in the amount of $21,723. Following the special notices, the company cancelled orders for five new trucks which were already on order. T. J. Carmody, vice-president of the company, and in charge of credit, testified by deposition as follows: that the dollar amount of business transacted with Robinson for parts in 1955 was $202.71; in 1956, $123.09; in 1957, for parts, $1,140.56, and for trucks, $24,080, and in 1958, for parts, in the amount of $20.64. The witness stated that Robinson was indebted to the company on March 3, 1958, in the sum of $21,723, and the indebtedness was past due in the amount of $669. Carmody stated that his attitude concerning Robinson changed after March 3, 1958, in that it became less favorable, but that this change in attitude was due to Robinson's delinquency in accounts, rather than because of receiving the special notices. The witness admitted, however, that following receipt of these notices, he called appellee and said, ''What's going on down there, Robinson? I have a notice that you are out of business.'' Carmody insisted, however, that the reports had nothing to do with his less favorable attitude toward Robinson's credit.

Appellee testified that he had bought motor truck equipment from the White Motor Company of Dallas since 1945, and owned the first White tractor that ever came to Springdale; that nothing had been sold to him by this company since March 3, 1958, although he had requested credit. Hurshel Martin, regional business manager for White Motor Company, testified that on March 3, 1958, though appellee was indebted to White for three trucks, and part of the amount was past due, his attitude toward Robinson had not changed.

Robinson testified that he had bought large quantities of motor truck equipment from International-Harvester since 1940, but after March 3, 1958, the company repossessed three tractors, upon which an indebtedness was due.

W. A. Cary, credit manager for International-Harvester in Little Rock, testified that Robinson purchased three motor trucks from the company's Fayetteville dealer in August, 1956, under the terms of 10% down and the balance due in thirty-six equal monthly installments. Mr. Cary stated that on March 3, 1958, appellee was indebted to the company in the amount of $19,000, several monthly payments being past due. The witness testified that it became necessary to repossess this equipment in April, 1958. He said that he received the special notice reports issued by Dun & Bradstreet referring to Robinson, but that these notices had no connection whatsoever with the repossession of the trucks. Cary stated the company, during that same period of time, had an open account with Robinson for service work done, and for parts furnished for these trucks by the service department and various company installations around the country; that the account was current on March 3, 1958. The witness testified that appellee had not been satisfied with the engines in the trucks, and had contended that the engines would not perform the job. Cary stated that considerable work was done on these engines by Cummins (maker of the engines), probably about a thousand dollars each on all three, but that Robinson was never completely satisfied with the results. Cary agreed that the past due accounts on the trucks were due almost entirely to the fact that Robinson was claiming engine trouble. The witness stated that when the trucks were sold to Robinson, the latter's financial condition was investigated, and the line of credit authorized. He testified that he considered Dun & Bradstreet a reliable company, and felt that credence could be placed in their reports.

Robinson testified that he had been buying diesel trucks from Mack Trucks, Inc., of Plainfield, New Jersey, since 1955, and that the last purchases were made in 1957. Appellee stated that after March 3, 1958, the company so pressed him for money on the last two trucks purchased, that he agreed to clean them up, overhaul them, repaint them, and sell them, in order to pay the indebtedness. A. F. Seiferth, division credit manager for Mack Trucks,

Inc., of Dallas, Texas, testified by deposition, that the account was delinquent during the year preceding March 3, 1958, and though he had recommended that the trucks be repossessed, it was decided that the debtor would be given an opportunity to refinance the indebtedness and become current. The witness stated that the first refinance payment was due in February, 1958, but the check was returned for insufficient funds, and the payment was not made until April. The March refinance payment was made in May. Mr. Seiferth testified that the Dun & Bradstreet special reports did not affect in any way the credit or business relationship between Robinson and the company, though he admitted that he sent a telegram on March 10, 1958, to Keith Skelton in Springdale, dealer for Mack Trucks, as follows: "Dun & Bradstreet advise Joe Robinson out of business 2/26. What about our trucks?" The witness stated that the reason for the telegram was to urge repossession of the trucks, since the indebtedness was past due.

Robinson testified that because of a loss of credit, he had been unable to finance his business; that since March 3, 1958, he had continued to operate by selling equipment, borrowing from relatives, borrowing on life insurance, and had been forced to "just scramble any way I could to get some working capital." Appellee testified that he sold equipment to several dealers in order to obtain capital, including Fred Inmon of Southwest Truck Sales in Little Rock, to whom he sold equipment for a price much below the actual value. Inmon testified that he bought six trailers from Robinson, the first being purchased on March 3, 1959, at a price of $3,500. Inmon stated that he sold this trailer for $5,000. The second was purchased on May 28th for which he likewise paid $3,500. Four others were purchased for $12,000. The witness placed the fair market value of the last five trailers at $5,500 to $6,000 each.

Appellants vigorously contend that there is no competent evidence to establish special damages, and that to be entitled to special damages, appellee must have shown (1) that damages sustained were caused solely by the publications, and (2) evidence of a specific nature must be

offered to enable a jury to measure in dollars the amount of damages suffered. They point out, that in most instances, representatives of the companies who received the publications stated that these publications had no effect upon their relationship with Robinson. Appellants lean to the view that any loss of business, or loss of credit suffered by appellee, was occasioned by the fact that Robinson was "slow pay," and they assert that he was already suffering reverses before the special notices were sent out. They further contend that, even though their first assertion be incorrect, appellee has shown no specific monetary loss; that the testimony relative to loss of business is of no value because this evidence was based on gross business with the several concerns; that a claim for damages cannot properly be based on gross figures because there are too many extraneous factors that would affect the amount of profit.

We agree, in this case, that appellee's damages cannot be based upon loss suffered from customers who were not subscribers to the service furnished by Dun & Bradstreet, and that the award made must be substantiated by proof of losses occurring from subscribers, because of the influence of these reports. We do not agree, however, that appellee was required to pinpoint, with the specificity urged by appellants, the monetary loss suffered by him, and to be suffered by him, in order to recover. According to Robinson, his gross volume business with the Hill Company in 1957, and up until March 3, 1958, was nearly $31,000, and he had handled no business for that company since that date. This was not denied. The witness testified that in 1957 he had a gross volume of business with the Cook Company of $3,500, but nothing after the aforementioned date. This was not denied. No figures were given, but he testified that he had previously hauled frozen poultry for Fairmont Foods of Omaha, but had handled no business after March 3. The proof relative to Schmieding Brothers showed that Robinson was still handling business, but the shipments were of a less profitable nature, and Schmieding testified that this was because "there was a definite question in our mind as to his

operation *after we received the reports.'"*[7]  We thus have according to the undisputed evidence, a total loss of business from the Hill and Cook accounts, which had grossed $34,500 in the preceding year, as well as a loss of profitable business from the Schmieding account. It is true that these gross figures do not take into consideration the cost of operations, such as hauling, and other factors that must be ascertained before a net profit can be determined, *i.e.,* net profit figures on these operations are not in the record.  Appellee did endeavor to testify as to his amount of net loss in the Schmieding business, after making a general computation, estimating $2,275 per year, but this evidence was precluded by the court, which held that the profits must be shown on an individual truck-load basis.  In *Proto* v. *Bridgeport Herald Corporation,* 136 Conn. 557, 72 A. 2d 820, the court permitted evidence of gross sales, and an estimate of the net profit on the gross sales.[8]  This seems logical, as a foremost concern of a businessman is the profit he makes, and most are likely familiar with the net profit derived from a particular type of business which is engaged in daily.  See also 32 C.J.S., Evidence, § 503, p. 166.  However, the jury did not have the benefit of this evidence, and there is no need in our discussing it, since we are only concerned with determining whether sufficient evidence did reach the jury to support its ver-

[7] Emphasis supplied.

[8] The court said: "As regards special damages, which consisted of a claimed loss of profits in the plaintiff's business, the defendant contends that the evidence did not justify the jury in finding that there was a causal relationship between the libel and any loss of business by the plaintiff and, in addition, that proof of actual loss of profits went no further than to be merely speculative. * * *  There was evidence both that, immediately following the publication, the business done in the plaintiff's store fell off in volume and continued to diminish until he sold the business in August and that after the publication the plaintiff failed to see in the store several customers whom he had been in the habit of seeing before.  In view of the fact that the libel was one which was calculated to injure the plaintiff's business, the jury might well have found that the libel was the cause of the loss of business. With reference to the amount of the loss sustained by the plaintiff, it is, of course, essential that such an amount be established with reasonable certainty. * * *  However, that such damages are difficult of accurate determination does not prevent recovery of them. * * *  So, in this case, the jury had evidence which it might have believed as to the gross sales made by the plaintiff for the few months before the libel * * *  until he sold his business.  Also there was testimony that his net profit before the libel was 20 per cent of the gross sales."

dict. Actually, we are of the opinion that the *loss of customers* is an element of damage, as much, or more so, than a loss of profits, for certainly one must have customers before he can ever make a profit. This point will be hereinafter further discussed, but we now discuss another element of damage, allegedly sustained by appellee, *viz.*, loss of credit.

Nothing is more important to the success of a business than its ability to obtain credit, for but few concerns are able to operate on a cash basis, and a loss of credit is fatal to the average business. This would be particularly true in the type of operation owned by Robinson, where the failure to obtain trucks and hauling equipment would simply put an end to the enterprise. The old adage, "Nothing succeeds like success," is certainly quite true, and likewise, nothing is more likely to bring about a complete failure of an undertaking than a belief on the part of ones' creditors that the endeavor is failing. Everyone is willing to extend credit to the successful man; few will extend credit to the business which they believe to be tottering. Loss of credit has long been recognized as coming within special damages. As stated in 53 C.J.S., § 268 (b), p. 390:

"Thus loss of fuel and clothing previously gratuitously furnished, the refusal of civil entertainment at a public house, loss of a marriage, loss of substantial hospitality of friends or third persons, loss of a customer, or refusal of credit is sufficient evidence of special damages."

See also 1 Harper & James, The Law of Torts, § 514, p. 389. We think there was sufficient evidence offered to justify a finding that Robinson had suffered a loss of credit from subscribers to the Dun & Bradstreet special reports. It is true that officials of the truck companies testified that the reports did not affect their attitude toward Robinson, but in view of their actions on receiving the reports, we think this was a question for the jury. As has been oft times stated, juries determine questions of fact. They pass on the reasonableness of evidence. They are priv-

ileged to accept or reject the testimony of a witness. They may believe some of his statements, and disbelieve others.

It will be noted in the citations quoted and mentioned in the preceding paragraph, that loss of customers is also an element of special damage. Though specific proof was not forthcoming that the Dun & Bradstreet reports were the sole cause of the loss of customers Hill and Cook, we think this evidence was likewise a strong circumstance to be considered by the jury. Of course, the very nature of this type of loss precludes definite ascertainment of the specific amount lost. Who can say how much business Hill & Company would have given Robinson in 1958 (after March 3rd)—in 1959—in 1960? Who can determine the volume of business that would have been transacted with Cook & Company in those same years—or the years to come? It would be manifestly unjust to deny recovery to one who had been damaged because the nature of his damages was not susceptible to dollars and cents proof. We like the logic expressed in the English case of *Ratcliffe* v. *Evans,* 2 Queen's Bench (1892) 524:

"In all actions accordingly on the case where the damage actually done is the gist of the action, the character of the acts themselves which produce the damage, and the circumstances under which these acts are done, must regulate the degree of certainty and particularity with which the damage done ought to be stated and proved. As much certainty and particularity must be insisted on, both in pleading and proof of damage, as is reasonable, having regard to the circumstances and to the nature of the acts themselves by which the damage is done. To insist upon less would be to relax old and intelligible principles. To insist upon more would be the vainest pedantry."

Let it also be borne in mind that counsel for all parties agreed during oral argument that no remand was desired, and the Court was asked to either affirm, or reverse and dismiss, this judgment in its entirety. We are of the view that, under this agreement, *any* special damage established by appellee would require an affirmance. Be that as it may, we deem the proof more than adequate to uphold

special past compensatory damages in the amount of $10,000, and future special compensatory damages in the amount of $20,000.

Affirmed.