**Thomas ANDREWS, Plaintiff,**

v.

**MOHAWK RUBBER COMPANY, Defendant.**

**No. H–75–C–63.**

United States District Court, E. D. Arkansas, E. D.

July 30, 1979.

Robert J. Donovan, Ray & Donovan, Mariana, Ark., for plaintiff.

James M. Moody, Wright, Lindsey & Jennings, Little Rock, Ark., for defendant.

## MEMORANDUM OPINION

OREN HARRIS, Senior District Judge.

This action was commenced by complaint filed in the Circuit Court of Phillips County, Arkansas, on November 24, 1975. Plaintiff, Thomas Andrews, alleges that he is a resident citizen of Phillips County, Arkansas, and that defendant is a corporation organized under the laws of and having its principal place of business in the State of Ohio. It is further alleged that agents of defendant, while acting within the course and scope of their employment, did communicate among themselves and to other agents and employees of the defendant corporation false and defamatory statements, with malicious intent, which resulted in the plaintiff being fired as industrial relations manager of defendant's manufacturing facility at Helena, Arkansas. Plaintiff alleges that he

has sustained $50,000 in actual damages and seeks punitive damages of $50,000.

Defendant removed the proceedings to this Court and filed answer, admitting that plaintiff's employment had been terminated, admitting the agency of the employees involved, denying malice, and contending that the statements, if defamatory, were not actionable in that they were uttered within protection of a privilege.

By amendment, plaintiff increased his prayer for damages to $150,000 compensatory and $100,000 punitive. Motion for summary judgment prior to trial was denied. By agreement of the parties, the demand for trial by jury was withdrawn and the cause was set for trial to the Court, without the intervention of a jury. Pursuant to regular setting the cause came on to be heard on January 22 and 23, 1979. Plaintiff was present in person and represented by his attorneys, Honorable Robert J. Donovan and Honorable Carroll Ray. Defendant was represented by its attorney, Honorable James Moody. Evidence was heard and taken in the form of oral testimony, depositions and exhibits. After both parties had rested, the cause was taken under advisement awaiting the filing of suggested findings of fact and conclusions of law, together with briefs of counsel.

The Court has received and reviewed the suggested findings and conclusions and has reviewed the pleadings, the evidence heard and taken, and considered the briefs and argument of counsel. After such review, the Court makes the following findings of fact and conclusions of law, which are incorporated herein pursuant to Rule 52, Federal Rules of Civil Procedure:

Plaintiff, Thomas Andrews, is a resident citizen of the State of Arkansas and defendant, Mohawk Rubber Company, is a corporate citizen of the State of Ohio. The amount in controversy exceeds $10,000, exclusive of costs and interest. This Court, therefore, has removal jurisdiction pursuant to the provisions of 28 U.S.C. § 1441(a) and 28 U.S.C. § 1331 by reason of complete diversity of citizenship of the parties and the jurisdictional amount in controversy.

The facts are, essentially, undisputed. Plaintiff was employed by defendant in June of 1953 as a shipping clerk. He has a high school education and did not attend college, but did study management and insurance by extension. He was a member of the hourly wage unit at defendant's Helena, Arkansas, facility where automobile tires were manufactured. He worked at various jobs in the plant, was a member of the local union, and was elected president of the United Rubber Workers local union at the plant in 1965.

He served as president of the local union for some four years. In 1969 he travelled to Salem, Virginia, where Mohawk had a similar manufacturing facility whose workers were not members of a labor union. His purpose was to aid the union and employees at the Salem plant in organizing the employees into a local union. A union election was conducted, which the union lost.

Plaintiff returned to work in the hourly wage unit at Helena. He was shortly thereafter employed in the management unit, first as personnel manager and then as manager of industrial relations. He conducted many arbitrations successfully and was considered by the general manager of the facility and by the corporate industrial relations manager in Ohio to have performed his duties in an exemplary manner.

In the spring of 1975 the union undertook another campaign to organize the workers at Mohawk's Salem, Virginia, facility. Mohawk, in accordance with a strong corporate policy, resisted such organization. Mohawk had stated as one of the reasons the Salem employees should not organize that labor-management strife could be expected, should they unionize. The union organizers considered this an important point, and dispatched Emory Howard and William Smith, workers at the Salem plant, to the Helena plant.

The purpose of the visit to Helena was to obtain proof that the organization of the Helena workers had resulted in no disruption in labor-management relationships, and to show the harmonious working conditions

at Helena. The visitors met with Tom Pearson, current president of the union local at Helena, and other members of the local. They desired to visit the plant and, if possible, obtain motion pictures of the inside of the facility during working hours.

Plaintiff knew in advance of their arrival that these visitors could be expected. He and the general manager of the Helena facility, Richard Gibson, had discussed the possible visit and the importance of keeping the visitors out of the plant. Plaintiff stated that he was requested by Tom Pearson to permit the men from Salem to enter the facility, but that he refused them entry.

Despite this refusal, the men from Salem entered the plant by the back gate, surreptitiously entered the building, and obtained motion picture film to demonstrate the workings at the plant, and to prove that they had in fact entered the plant. The organizers distributed pamphlets at the gates of the Salem plant, after the return of Emory Howard and William Smith, indicating that they had visited within the Helena plant, and inviting the workers to see the films taken and descriptions of the working conditions at Helena.

Jack Burge, plant manager at Salem, observed the handbills reporting the trip, and inquired of Smith about the visit. He was told that they had enjoyed the trip, and that they were let into the plant by a person named "Tom". From reference to the person as "Tom who was here (in Salem) in '69", Burge concluded that "Tom" was the plaintiff, Tom Andrews, whom he knew to have visited Salem for the union organizers in 1969.

Burge reported what Smith had told him to his superior, Larry Spencer, the general manager at Salem. Spencer was greatly surprised that the union organizers from Salem had gained admittance to the Helena plant, as he had called the general manager at Helena to warn of their impending visit and asked that they be kept out. He called Helena to speak to Richard Gibson, who was not available. He then spoke with Bill Jones, the plant manager, and inquired about the visit by the Salem employees.

Jones knew nothing about their entry into the plant.

Spencer then asked to speak with plaintiff. When he told him that the Salem men had gained entry at Helena, plaintiff seemed surprised. When advised that the men had said that he had admitted them, plaintiff emphatically denied that he had assisted or permitted their entry.

Spencer then called his superiors at the home office in Hudson, Ohio, the corporate industrial relations manager, Charles Seitz, and the vice-president in charge of manufacturing, David King. He informed them of the report as a rumor and stated that Tom Andrews denied any connection with the entry of the organizers into the Helena plant. He was asked to investigate the report further, to confirm any involvement by plaintiff.

Spencer deferred any investigation of the incident until after the union election, upon advice of counsel, in order not to be charged with an unfair labor practice. After the union election at Salem, about June 12, 1975, Burge and Spencer met Smith and Howard on the parking lot at the Salem plant, where the company was furnishing refreshments to celebrate the fact that the company had won the election. A conversation ensued as to the person who had admitted them to the Helena plant.

From this conversation, the details of which are disputed in the evidence, Spencer and Burge received the impression that Smith and Howard had again identified plaintiff as the person who had admitted them to the Helena plant. Shortly thereafter, Spencer called Charles Seitz, corporate industrial relations manager, and related that Smith and Howard had confirmed that plaintiff, Tom Andrews, was the person who had assisted their entry into the Helena plant.

Don Hastings, industrial relations manager at Salem, had independently reported substantially the same information to Spencer, after the first rumor had been reported to him by Burge. The Court finds and concludes that Burge, Hastings, Spenc-

er and Seitz were each under a duty owed to the defendant corporation, by virtue of the duties of their employment, to report to their superior in the corporation any report of such a contravention of company policy by another employee of the corporation. David King, by virtue of his office, was the person by whom such reports were expected to be received.

David King, in his capacity as vice-president of the corporate defendant, had been hired with a mandate to revamp the management, with a particular emphasis on causing the various manufacturing facilities to more closely reflect corporate policy. He had a low opinion of plaintiff, Tom Andrews, as industrial relations manager at the Helena plant, prior to the receipt of the reports from Salem. This was induced by the prior connection of Andrews with the union, his lack of college degree, and other factors which induced in Mr. King a "gut" feeling that Andrews would not be retained.

Shortly after receiving the second report from Salem, Mr. King called Richard Gibson at Helena, and instructed him to fire Andrews. Gibson, a close friend of plaintiff, did not believe the report and refused to fire plaintiff. David King then personally travelled to Helena and summarily terminated plaintiff's employment with Mohawk, without explanation. He had previously indicated to Gibson that the report was the reason for the firing. Although the Court credits the testimony of Mr. King that he had a pre-existing intention to replace Andrews as industrial relations manager, the Court finds and concludes that the reports from Salem did result in King making the decision to fire plaintiff on July 10, 1975, rather than at a later date.

Defendant did not plead, nor did it attempt to prove, that the reports that plaintiff had assisted or permitted the men from Salem to enter the Helena plant were true. The Court finds and concludes that the reports by Burge and Hastings to Spencer, the reports from Spencer to Seitz and King, the reports by Seitz to King, and the reports from King to Gibson, were all untrue.

■ The Court further finds and concludes that the false reports were of such a nature, considering the circumstances of the impending union election at Salem, the policy of the corporation, and the nature of the position that Andrews held with the corporation, that they were *per se* defamatory. The reports, if believed, were certainly of such a nature as to be injurious to the employment and business relationship of the plaintiff with the corporation and to his reputation as a corporate industrial relations manager. See *Reese v. Haywood,* 235 Ark. 442, 360 S.W.2d 488 (1962). The injurious nature of the reports is borne out by the termination of plaintiff almost immediately after the "confirmatory" report was received by David King, and his resulting monetary damages.

■ It is undisputed that the statements were made by the employees of defendant corporation while acting within the scope and in the course of the business of the corporation. The corporation is, therefore, responsible for such statements under the doctrine of *respondeat superior* pursuant to Arkansas law, *Waters-Pierce Oil Co. v. Bridwell,* 103 Ark. 345, 147 S.W. 64 (1912); *Sinclair Ref. Co. v. Fuller,* 190 Ark. 426, 79 S.W.2d 736 (1935).

Thus, the Court comes to the central and deciding issue in the case, the assertion of defendant that the statements were made within a privilege and are not, therefore, actionable. The principle of conditional privilege in defamation actions is well established and defined in Arkansas decisions. The early case of *Bohlinger v. Germania Life Ins. Co.,* 100 Ark. 477, 140 S.W. 257 (1911), recognized the privilege and later cases have consistently followed the holding.

In *Bohlinger,* plaintiff had applied for a policy of life insurance with defendant insurance company and had also been appointed by the general agent as a soliciting insurance agent for the defendant company. Defendant requested Retail Credit Company to investigate plaintiff's qualifications as an agent and also to report on his condition

as an insurance risk. The report received was highly uncomplimentary, and was defamatory *per se* in its contents.

Defendant communicated the Retail Credit reports to the physician employed by the company to evaluate insurance risks and to its general agents in Arkansas, inquiring whether, in light of the reports, plaintiff should be continued in his employment as agent and whether the company should continue to insure his life. Both the physician and the agent reported to the defendant that the Retail Credit reports were in error, the policy was permitted to remain in force, and plaintiff was permitted to continue as a soliciting agent for defendant. The report was seen only by the home office, the general agents, the physician, and a secretary of the general agents.

The Arkansas Supreme Court, after reviewing the facts of the *Bohlinger* case, stated in its opinion:

"A communication is held to be qualifiedly privileged when it is made in good faith upon any subject-matter in which the person making the communication has an interest, or in reference to which he has a duty, and to a person having a corresponding interest or duty, although it contains matter which, without such privilege, would be actionable. Upon such occasion and under such circumstances, although the matter communicated is defamatory and false, the law will not infer malice, but the existence thereof must be shown by some evidence beyond the falsity of the statements communicated. Communications made by a principal to an agent, or by an agent to a principal, relative to the subject-matter of the business of the agency or employment, and containing information or giving direction relative thereto, fall within the class of privileged communications, although they contain defamatory matter concerning a third person."

\* \* \* \* \* \*

"If it is shown . . . that the occasion therefor was abused, or that the statements were not relevant to or went beyond the subject-matter or purpose of the agency or business, or that the statements were made from malice proved, then no protection will arise . . . Such intrinsic or extrinsic evidence would show a want of good faith, and would repel the inference that there was no malice."

■ The elements necessary to a qualified privilege are all present in this case. The statements about plaintiff were, the Court finds, made in good faith. Each of the persons who made the statements was an agent and employee of the defendant corporation, and each, by virtue of the duties of his employment, had a duty to communicate the report to the person to whom he communicated. Each of the persons to whom the statements were communicated was also an employee of the defendant corporation, and a person to whom, by virtue of the duties of his employment, the report should have been communicated. The statements contained information relative to the business of defendant corporation. Each of the persons, by virtue of his duty to the corporation as a management employee, had a duty to report the information received, whether he believed the report to be true or not. The Court finds that none of the employees who made the statements embellished the seriousness of the charge or unnecessarily added any matter deleterious to plaintiff.

The Court, therefore, finds and concludes that each of the communications of the statements defamatory of plaintiff were within the conditions necessary to the establishment of a conditional privilege. The privilege is, as its name implies, subject to being lost. The privilege ceases to exist upon a finding that the defamatory statement was communicated to one not a party to whom its communication was necessary, or upon a finding that the person making the statement was actuated by actual malice toward the person defamed, or by a finding of implied malice.

■ Although there was some implication that the statement might have been communicated to a prospective employer of

the plaintiff, had the occasion warranted, there is no evidence that any such communication occurred to a person outside the privilege. The prospective employers who inquired of the plaintiff were, the Court finds, not informed that the plaintiff had been even suspected of giving aid to union organizers while acting as industrial relations manager. They were merely informed that the defendant corporation had "lost confidence" in him. Such statements are not, the Court concludes, defamatory of plaintiff. They carried no implication of a charge of betrayal of confidence, and were accompanied by laudatory descriptions of his performance as industrial relations manager.

■ In *Dun & Bradstreet, Inc. v. Robinson,* 233 Ark. 168, 345 S.W.2d 34 (1961), the Supreme Court of Arkansas made clear that the malice which would remove the protection of privilege from defamatory statements is not limited to hate, vindictiveness or animosity but may be found, when circumstances warrant, in reckless disregard of the rights of another or such conscious indifference to results as could be regarded as willfully wrong.

■ The cases cited in *Dun & Bradstreet, Inc. v. Robinson,* supra, and the circumstances reviewed by the Court in finding that defendant and its employee had acted with such conscious indifference and reckless disregard of the rights of Robinson as to remove the cloak of privilege, are not to be found in the facts here presented.

First, the Court finds that there was no *actual* malice on the part of Burge, Spencer, Seitz, King, or any other person in the line of communication within the corporate management, toward the plaintiff. It appears from the evidence that Tom Andrews was well liked by Burge, Seitz and Gibson. There is no hint in the evidence of any motivation whatever that any of these persons, particularly Burge, Spencer and Hastings, who originated the statements after first-hand conversations with the union organizers involved, Smith and Howard, might have had to harbour malice toward plaintiff. Neither does there appear any

motivation that they should have manufactured the allegations out of whole cloth. In fact, when the initial report was received, none of them even knew that Smith and Howard had gained entry into the Helena plant.

Spencer's first act was to call his counterpart at Helena, Gibson, to determine whether entry had been made. He could not contact Gibson, but did contact plaintiff, who at first made jokes, but when convinced of the seriousness of the allegation, denied that he assisted or permitted the entry. It was only after securing plaintiff's side of the story that Spencer made his report of the comments of Smith to Seitz and King in Ohio. He also at the same time reported that plaintiff emphatically denied any involvement. King took no action on the basis of this first report, but directed further investigation by Spencer and Burge.

As soon as the union election was over, Spencer and Burge contacted Smith and Howard directly and inquired about the method by which they had gained entry into the Helena plant. From that conversation, the Court finds and holds that Spencer was in good faith in reporting to Seitz that Tom Andrews had been identified by Smith and Howard as the person who had let them into the back gate of the Helena plant. Perhaps Smith and Howard, seeing plaintiff talking amiably to Tom Pearson, their host and local union president, were under the impression that plaintiff had assisted their entry. Perhaps they were mistaken in their identification of plaintiff. Perhaps there was a complete misunderstanding between Smith and Howard on one hand and Burge and Spencer on the other as to the identity of the person in question. Such speculation is not necessary, in view of the good faith belief on the part of Spencer when he made the report that it was accurate.

Neither can it be said, in view of the circumstances, that Spencer or Burge acted with conscious indifference to the effect that the report would have on plaintiff, or with reckless disregard as to whether the report was true or false. They had gone to

the persons at their plant who had first hand knowledge as to the facts, and had received what they considered to be confirmation from that source as to the identity of plaintiff as having assisted their entry. Spencer had already received a denial of the allegations directly from plaintiff. Seitz had a duty to pass the report on to King, who had requested the investigation, and who had the responsibility to determine whether the report should have been investigated further, or whether to act.

King, having already determined in his own mind that the plaintiff would be replaced as industrial relations manager, determined after receiving the confirmatory report to go ahead and fire plaintiff at that point, without further investigation. The result of the second report was the termination of plaintiff forthwith as industrial relations manager of defendant, and his discharge as an employee of defendant corporation at that time, rather than at a later date.

From these facts as found by the Court, when contrasted with the lack of investigation, lack of foundation, lack of confrontation of the person defamed prior to publication, and similar evidence of recklessness and indifference found in the *Dun & Bradstreet, Inc. v. Robinson* opinion, the Court finds and concludes that the officers and employees of defendant involved in the communication herein were not guilty of such conscious indifference of the effects upon plaintiff or of such reckless disregard as to the truth or falsity of the statements, as to amount to imputed or implied malice.

The Court, further, from its review of the authorities, finds an implication that the duty of investigation imposed upon such a party as a credit reporting agency or similar organization to investigate and verify a report to be made as to the character or credit of another, and which performs such investigations and makes such reports as its usual and regular business, is greater than that imposed upon an employee who receives information important to his employer which might be harmful to a fellow employee, if believed.

*Dun & Bradstreet,* according to the cases involving that firm, holds itself out to furnish accurate reports by highly skilled and trained personnel, which it expects to be relied upon, and for which it charges a fee. In contrast, the employee, such as Burge or Spencer, without seeking the duty, has thrust upon him the option to breach a pre-existing duty of loyalty to his employer by keeping silent or to give the information to a responsible superior, merely by being the recipient of the information. The extent of the investigation required before communicating the information clearly depends upon the circumstances shown by the evidence of each case and the relationships of the parties involved. A bank auditor, for example, would be required to make a more extensive investigation of a person whom he had reason to suspect of embezzlement than would another teller who might have received information which would suggest embezzlement, before reporting the matter to an officer of the bank.

From all of the evidence, and in consideration of the authorities cited, the Court finds and concludes that the statements made by employees of the defendant corporation which were defamatory of plaintiff in his employment were protected by the conditional privilege, that this privilege was not removed or destroyed by communication to any person outside the privilege, that the communications were not more harmful in content than was warranted by the circumstances, and that the statements were not communicated on the basis of either actual or implied malice.

The Court, therefore, finds and concludes that the plaintiff, Thomas Andrews, has failed to prove his entitlement to recover damages on his complaint against defendant, Mohawk Rubber Company, and that the complaint should be dismissed, with plaintiff to bear the costs of the action.

Judgment will be entered accordingly.