**COUNTY VANLINES INC., Plaintiff,**

v.

**EXPERIAN INFORMATION SOLUTIONS, INC. a/k/a Experian, Defendant.**

**No. 01 CIV. 7075(WCC).**

United States District Court, S.D. New York.

April 30, 2004.

Jones Day, (Patrick G. Broderick, Esq., Of Counsel), New York City, for Defendant.

## *OPINION AND ORDER*

WILLIAM C. CONNER, Senior District Judge.

Plaintiff County Vanlines, Inc. ("CVL") brought this commercial defamation action against defendant Experian Information Solutions, Inc. ("Experian") seeking $2,500,000 in compensatory damages and $5,000,000 in punitive damages.[1] Plaintiff now moves pursuant to FED. R. CIV. P. 56 for partial summary judgment dismissing defendant's affirmative defense of truth. Defendant cross moves pursuant to FED. R. CIV. P. 56 for summary judgment dismissing plaintiff's Complaint in its entirety. For the reasons set forth herein, we grant defendant's cross motion for summary judgment, and we deny as moot plaintiff's motion for partial summary judgment.[2]

## BACKGROUND

The record, which includes this Court's previous opinions in this case,[3] reveals the following undisputed facts.[4] Plaintiff is a moving and storage business located in

Rabin & Rabin (Bernard Rabin, Esq., Of Counsel), Tarrytown, NY, for Plaintiff.

1. Plaintiff, a New York corporation with its principal place of business in Yonkers, New York, initially brought this action in the Supreme Court of the State of New York, Westchester County. Defendant is an Ohio corporation with its principal place of business in California and authorized to do business in New York. (Notice of Removal ¶ 1; Complt. ¶ 1; Ans. ¶ 2.) Subsequently, defendant removed the case to this Court. We have jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1441.

2. *See, e.g., Westchester Day Sch. v. Vill. of Mamaroneck,* 236 F.Supp.2d 349, 351 (S.D.N.Y.2002) (Conner, J.) (holding that "plaintiff's motion for partial summary judgment is granted, thereby rendering moot defendant's motion to dismiss.").

3. This Court has rendered two previous opinions in this case, familiarity with which is assumed. *See County Vanlines, Inc. v. Experian Info. Solutions, Inc.,* No. 01 Civ. 7075 (May 31, 2002) (denying plaintiff's previous motion for summary judgment on liability); *County Vanlines, Inc. v. Experian Info. Solutions, Inc.,* 205 F.R.D. 148 (S.D.N.Y.2002) (granting in part and denying in part plaintiff's motion to strike defendant's affirmative defenses).

4. In its motion for summary judgment, plaintiff failed to include the required Local Rule 56.1 Statement, but instead attached a "Local Rule 3G statement" from a previous motion in this matter. Local Rule 3G was the predecessor provision of Local Rule 56.1. We will assume that plaintiff intended this submission to substitute for its Rule 56.1 Statement, and we will cite it accordingly. Plaintiff's response to defendant's cross motion includes a properly labeled Rule 56.1 Statement.

Yonkers, New York. (Pl. Rule 56.1 Stmt. ¶ 1.) In April 2001, plaintiff applied at the Westchester County branch of the Bank of New York (the "bank") for a commercial loan to purchase a 52–foot trailer for its moving business. (*Id.* ¶ 3.) During the subsequent loan approval process, bank officials requested a copy of plaintiff's credit history from defendant, which is a credit reporting agency. (*Id.* ¶ 4.) Defendant erroneously sent to the bank the credit report of a different corporation named County Van & Storage, Inc. ("CV & S"). (*Id.* ¶ 6.) This credit report contained negative credit information about CV & S, all of which predated CVL's 1996 incorporation date. This information included documentation of late bill payments, past-due payments, a written-off unpaid cellular phone/paging account and a tax lien. (*Id.* ¶¶ 6–7; Rabin Decl., Ex. 14; Broderick Decl., Ex. R.) Relying on this credit report, the bank denied plaintiff's request for a loan. (Rabin Decl., Ex. 13.) Thereafter, plaintiff commenced this action on June 18, 2001. (Notice of Removal ¶ 2.)

Experian answered the Complaint by asserting, *inter alia,* that the credit report was true. (Ans., 2d Aff.Def.) Thereafter, plaintiff moved pursuant to FED R. CIV. P. 12(f) to strike that and other affirmative defenses. *See County Vanlines,* 205 F.R.D. at 149. We denied that motion with respect to the affirmative defense of truth because we concluded that there were issues of fact and law that required resolution, particularly whether plaintiff was the alter ego of CV & S. *Id.* at 154. In so holding, we took judicial notice of Judge Martin's opinion in *NLRB v. County Van & Storage, Inc.,* No. 97 Civ.2099, 1997 WL 282212, at *4 (S.D.N.Y. May 28, 1997), which denied CVL's cross motion for summary judgment on that issue because, although the NLRB had failed to establish "reasonable cause to believe" that CVL was the alter ego of CV & S, the factual record was nevertheless insufficient to prove that they were not the alter ego.[5] *County Vanlines,* 205 F.R.D. at 154. We held that because the NLRB action did not conclusively determine the alter ego status, there were "disputed issues of fact and law as to whether plaintiff was an alter ego of CV & S, and as a consequence, whether the disputed credit report was true" that precluded granting the motion to strike the affirmative defense. *Id.* We also denied plaintiff's motion to strike the affirmative defense of the qualified privilege afforded to credit reporting agencies under New York law, holding that "whether or not defendant acted with [the requisite] gross negligence turns in large part upon unsettled issues of fact." *Id.* at 157.

Discovery having concluded, plaintiff now claims that the affirmative defense of truth fails as a matter of law because defendant has not offered any additional proof tending to show that CVL is the alter ego of CV & S. (Pl. Mem. Supp. Summ. J. at 6–7.) Defendant contends in response that the record demonstrates the existence of a genuine issue of material

---

5. In *NLRB v. County Van & Storage, Inc.,* the NLRB brought an action against CV & S and CVL alleging that the companies committed various violations of the National Labor Relations Act (the "Act"). 1997 WL 282212, at *1. The NLRB moved for a preliminary injunction requiring the companies to recognize and bargain in good faith with a union until the matter could be fully litigated before the NLRB. *Id.* at 1997 WL 282212 *2. In determining whether the NLRB showed that there was "reasonable cause to believe" that the companies violated the Act, the court stated that "there is no question that the [NLRB] has presented evidence sufficient to show that there is a reasonable cause to believe that [CV & S] violated the Act," but that "[t]he real question ... is whether [CVL] is a disguised continuance or the alter ego of [CV & S] and is, therefore, bound by the bargaining obligations of that corporation." *Id.*

fact as to the alter ego/truth defense, and also cross moves for summary judgment on the ground that there is insufficient evidence of gross negligence or malice to overcome the qualified privilege afforded to credit reporting agencies. (Def. Mem. Supp. Cross Mot. Summ. J. at 6, 10.)

The additional undisputed facts adduced during discovery control the disposition of both plaintiff's motion and defendant's cross motion. CV & S was a New York corporation in the business of moving and storage. (Lucchesi Dep. at 8–10.) One hundred percent of the stock of CV & S was owned by Frank Lucchesi, who was the only officer as well. (*Id.* at 9–10.) CV & S was a local agent for Atlas Van Lines, a national moving company. (*Id.* at 13–14.) In 1994, Lucchesi sold CV & S to Bruce Michaels, but Lucchesi remained employed by Michaels in the sales department. (*Id.* at 15, 17.) CV & S subsequently was reincorporated as a Delaware corporation that became known as County Van & Storage of Delaware. (*Id.* at 18.) It continued, however, to do business at the same address. (*Id.* at 18–19.)

Thereafter, in 1996, Michaels failed to make payments on notes issued to Lucchesi. (*Id.* at 23.) Michaels then abandoned the business and Lucchesi foreclosed on the note, after which a corporation owned by Lucchesi known as F.L. Van Associates ("F.L.") took control of CV & S. (*Id.*) F.L. then became known as CVL, with Lucchesi as president. (*Id.* at 25–26.)

Lucchesi testified at his deposition that CVL is located at the same address as CV & S and has the same telephone number used by CV & S. (Lucchesi Dep. at 18–19, 32–33; Def. Rule 56.1 Stmt. ¶¶ 5–6, Ex. L.) The two companies also share some of the same employees, vendors and customers. (Lucchesi Dep. at 26–28.) After his 1994 sale of CV & S to Michaels, Lucchesi retained no ownership interest in the company and it had no officers or directors in common with CVL. (*Id.* at 78–79.)

The credit report that gave rise to the present litigation was not the first time that defendant issued a credit report about CVL. In December 1998, plaintiff applied for a loan from Fleet Bank. (Pl. Rule 56.1 Stmt. ¶ 13.) Fleet subsequently requested from defendant credit reports on both CV & S and CVL. (Broderick Decl., Exs. O–P; Poteraj Aff. ¶ 28.) On December 22, 1998, defendant sent to Fleet Bank a report with credit information about both CV & S and CVL.[6] (Pl. Rule 56.1 Stmt. ¶ 13; Broderick Decl., Exs. O–P; Poteraj Aff. ¶ 28.) The CVL report did not contain negative credit information, but the CV & S report contained the same negative credit information that appeared in the April 2001 report at issue in the present case. (Pl. Rule 56.1 Stmt. ¶ 13; Broderick Decl., Exs. O, P, R.) Fleet denied plaintiff's loan application. (Pl. Rule 56.1 Stmt. ¶ 13.) Thereafter, plaintiff requested a reinvestigation and obtained from defendant a credit report on January 14, 1999 referring only to CVL.[7]

6. The parties apparently dispute the number of credit reports sent to Fleet by defendant, with plaintiff stating that Fleet received one report that contained credit information concerning both CVL and CV & S, and defendant stating that Fleet received two separate reports—one for each company. (Pl. Rule 56.1 Stmt. ¶ 13; Def. Rule 56.1 Stmt. ¶ 1.) Neither party, however, claims that this discrepancy creates a genuine issue of material fact relevant to the disposition of the present dispute. Indeed, our independent review of the December 1998 credit report reveals that this dispute is largely one of semantics because the report is a single document, but is clearly divided into two separate sections with separate file numbers, one of which is devoted to CVL and the other to CV & S. (Broderick Decl., Ex. O.)

7. The January 14, 1999 credit report was accompanied by a form cover letter that read:
   Dear Business Executive:
   The enclosed business profile will confirm the results of our reinvestigation regarding the accuracy of credit information

(Pl. Rule 56.1 Stmt. ¶ 13; Broderick Decl., Ex.Q.) The record does not indicate whether plaintiff reapplied to Fleet for credit after receiving the reinvestigated report.

Brian Poteraj, a technical manager employed in that capacity since 1990 by defendant and its predecessor TRW, Inc., described the process by which defendant's computer search system retrieves businesses' credit information. (Poteraj Aff. ¶ 1.) Defendant's computer system stores items of credit information from thousands of sources, who include "contributors" such as banks, retailers, finance companies and collection agencies, in addition to the public record. (*Id.* ¶ 3.) Defendant does not originate or create credit information; it only stores information supplied to it. (*Id.*) Defendant maintains credit information on approximately 20 million businesses, and processes over 40 million updates to that information per month. (*Id.* ¶ 4.)

Defendant has developed a process of matching business information with its computer system that is intended to address matching problems caused by, *inter alia,* name changes, address changes, misspelling, misreading and inconsistent identification. (*Id.* ¶ 6.) When contributors provide credit information to defendant, they include certain identifying information. (*Id.* ¶ 7.) This information is collected primarily from lenders' accounts receivable files, and usually includes the "doing business as" name of a business as shown on, for example, signs and letterheads, and not necessarily its corporate legal name that is on file with the secretary of state.

(*Id.* ¶ 8.) When a subscriber requests a credit report, that subscriber submits similar information about the subject of the requested report. (*Id.* ¶ 7.)

Defendant does not store information as completed credit reports. (*Id.* ¶ 10.) Rather, when a subscriber requests a credit report, the computer system creates a report by comparing and matching the information provided by the subscriber with information contained in the system. (*Id.* ¶ 11.) The subscriber obtains the information that it provides to defendant by requesting it from the potential borrower. (*Id.* ¶ 13.) This information includes identifying information that may not be unique to a particular business, such as addresses and similar business names. (*Id.* ¶ 12.) Defendant has no control over the accuracy or completeness of the information provided to it by subscribers or contributors for the generation of reports, including whether the subscriber has correctly identified the potential borrower. (*Id.* ¶ 13.)

The computer system does not require 100 percent matching between information provided and information in the database because that level of precision would eliminate a lot of accurate and relevant data by precluding consideration of identification material that varies even slightly. (*Id.* ¶¶ 17–18, 20.) To ensure accuracy in matching, the system's matching system ascribes different weights, obtained from extensive statistical analysis, to a variety of identifying factors. (*Id.* ¶ 19.) If the computer system identifies multiple candidates that match the information provided, defendant sends the match list to the sub-

reported to Experian Business Solutions, Inc., under the business name and address provided.

If the source which provided the information was unable to verify the information's accuracy, or did not respond to our reinvestigation request, then the information in question was deleted from the file and no longer appears on the report.

If your business was denied credit due to inaccurate information on the Experian report, please provide below the name, address, and fax or telephone number of the business which denied your business credit. Please fax or mail this form to us and we will contact them on your behalf to report the change(s) to your credit report. (Broderick Decl., Ex. Q.)

scriber. (*Id.* ¶ 14.) The subscriber may elect to receive up to five reports from that list, and will only be charged for one report. (*Id.*) Defendant does not keep copies of the reports that it ultimately sends to its subscribers. (*Id.*)

In the present case, Lucchesi completed and signed the loan application with the Bank of New York. (Lucchesi Dep. at 53.) CVL was identified by name on the application form as "County Van Lines," rather than the more accurate "County Vanlines." (Broderick Decl., Ex. L.) Thereafter, when defendant created a credit report at the bank's request, Poteraj testified that the similarity in name between "County Van Lines" and the former "County Van & Storage," as well as the identical addresses and similar businesses, caused the computer system to provide information on both companies. (Poteraj Aff. ¶¶ 22, 24.) Indeed, some companies reporting information to defendant about plaintiff still use the business name "County Van & Storage." (*Id.* ¶ 23.)

The bank then relied on the negative report dated April 4, 2001, in which the business was identified as "County Van & Storage, Inc.," and denied plaintiff's request for a loan on April 20, 2001. (Rabin Decl., Exs. 11–12.) Thereafter, plaintiff obtained from defendant a copy of this report on April 16, 2001, and a subsequent report in July 2001 identifying the company as "County Vanlines, Inc." that did not include the negative information. (Rabin Decl., Exs. 13–15.) Defendant subsequently separated the information linking the two companies, and has not thereafter published any further credit reports that link the two companies. (Poteraj Aff. ¶ 27.)

## DISCUSSION

### I. *Standard of Review*

Under Fed. R. Civ. P. 56, summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). The burden rests on the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant for a reasonable jury to return a verdict in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Services, L.P.*, 22 F.3d 1219, 1224 (2d Cir.1994).

### II. *Whether Defendant's Statements Were Protected By the Qualified Privilege*

To establish a prima facie case of defamation, a plaintiff must prove the publication of a false statement that "tends to 'expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society.' " *Foster v. Churchill*, 87 N.Y.2d 744, 751, 665 N.E.2d 153, 642 N.Y.S.2d 583 (1996) (citation omitted). A defamation action is for the tort of libel, rather than slander, when the statement at issue is published in written, and not spoken, form. *See, e.g., Al-*

bert v. Loksen, 239 F.3d 256, 265 (2d Cir. 2001). Moreover, even though a statement may be defamatory, "there exists a qualified privilege where the communication is made to persons who have some common interest in the subject matter." *Foster*, 87 N.Y.2d at 751, 642 N.Y.S.2d 583, 665 N.E.2d 153. Credit investigation and reporting agencies enjoy this qualified privilege and are "not liable for defamation unless the defamatory matter was uttered with malice or such a wanton and reckless disregard of the rights of another as is ill will's equivalent." *Mil–Hall Textile Co. v. Dun & Bradstreet*, 160 F.Supp. 778, 780 (S.D.N.Y.1958); *accord A.B.C. Needlecraft Co. v. Dun & Bradstreet, Inc.*, 245 F.2d 775, 777 (2d Cir.1957); *see also Weir v. Equifax Servs., Inc.*, 210 A.D.2d 944, 945, 620 N.Y.S.2d 675 (4th Dep't 1994) ("It is the very function of the qualified privilege to protect the conduct of a credit investigative reporting company ...."). To survive a motion for summary judgment, a plaintiff has the "the burden of presenting evidence in admissible form sufficient to raise a triable issue whether the statements were made with malice ...." *Weir*, 210 A.D.2d at 945, 620 N.Y.S.2d 675; *accord Albert*, 239 F.3d at 272–73; *Liberman v. Gelstein*, 80 N.Y.2d 429, 437, 605 N.E.2d 344, 590 N.Y.S.2d 857 (1992).

A plaintiff does not make the requisite showing of malice simply by conclusorily labeling the defamation malicious. *Shamley v. ITT Corp.*, 869 F.2d 167, 173 (2d Cir.1989). A plaintiff must present evidentiary facts which support this conclusion. *Id.; see also Kasachkoff v. City of New York*, 107 A.D.2d 130, 135, 485 N.Y.S.2d 992 (1st Dep't 1985), *aff'd*, 68 N.Y.2d 654, 496 N.E.2d 226, 505 N.Y.S.2d 67 (1986). "This burden may not be met by 'surmise, conjecture and suspicion' ... nor by 'mere conclusions, expressions of hope or unsubstantiated allegations or assertions ....'" *Id.* at 134, 485 N.Y.S.2d 992 (citations omitted) (quoting *Shapiro v.*

*Health Ins. Plan*, 7 N.Y.2d 56, 63, 163 N.E.2d 333, 194 N.Y.S.2d 509 (1959) and *Dano v. Royal Globe Ins. Co.*, 59 N.Y.2d 827, 829, 451 N.E.2d 488, 464 N.Y.S.2d 741 (1983)).

The malice requirement is satisfied if the plaintiff presents admissible evidence demonstrating that the statements were made with malice under either the constitutional or the common-law malice standards. *See Albert*, 239 F.3d at 272–73; *Liberman*, 80 N.Y.2d at 437, 590 N.Y.S.2d 857, 605 N.E.2d 344; *Weir*, 210 A.D.2d at 945, 620 N.Y.S.2d 675. Defendant argues that plaintiff has not established a sufficient degree of malice under either standard to overcome the qualified privilege afforded to credit reporting agencies. (Def. Mem. Supp. Cross Mot. Summ. J. at 6.) Plaintiff argues otherwise. We conclude that plaintiff has not made the requisite showing of malice. Beyond conclusorily alleging gross negligence and "ill will's equivalent," plaintiff has not offered any admissible evidence to support its factual allegations and negate defendant's claim of qualified privilege.

### A. *Common–Law Malice Standard*

"Common-law malice 'mean[s] spite or ill will' ... and defeats the privilege only if it is 'the one and only cause for the publication....'" *Albert*, 239 F.3d at 272 (citations omitted) (quoting *Liberman*, 80 N.Y.2d at 439, 590 N.Y.S.2d 857, 605 N.E.2d 344); *see also Weir*, 210 A.D.2d at 945, 620 N.Y.S.2d 675. Plaintiff does not offer any evidence that defendant published the alleged false reports solely out of spite or because of ill will towards plaintiff. Instead, plaintiff contends that defendant has a "condition precedent" of good faith and that "it rests with the person claiming the privilege to show that the case comes within the exception." (Pl. Mem. Opp. Cross Mot. Summ. J. at 4–5, 12.) We find no legal support for this proposition, par-

ticularly in the present case wherein it is undisputed that a qualified privilege is available for credit reporting agencies in the absence of malice.[8]

In any event, plaintiff has not introduced any evidence sufficient to create a triable issue of fact as to whether ill will, assuming its presence, was the *sole* motivating factor for the alleged false publication. Indeed, defendant has proffered uncontradicted evidence showing that the credit report was published because of the numerous similarities between CVL and CV & S, many of which have been acknowledged by plaintiff. (Poteraj Aff. ¶ 24; Def. Rule 56.1 Stmt. ¶¶ 4–9; Pl. Rule 56.1 Stmt. ¶¶ 4–9.) Accordingly, we conclude that plaintiff has not demonstrated the existence of a triable issue of fact with respect to the presence of common-law malice.

## B. *Constitutional Malice Standard*

■ Satisfaction of the well established constitutional or actual malice standard first articulated by the United States Supreme Court in *New York Times v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), will defeat the qualified privilege in a defamation action. *See, e.g., Liberman,* 80 N.Y.2d at 437–38, 590 N.Y.S.2d 857, 605 N.E.2d 344; *Weir,* 210 A.D.2d at 945, 620 N.Y.S.2d 675. Under the *New York Times* standard, a plaintiff need not prove that actual ill will was

the sole motivating factor for the publication of the defamatory statement, but "must demonstrate that the 'statements [were] made with [a] high degree of awareness of their probable falsity.' ... In other words, there 'must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of [the] publication.' " *Liberman,* 80 N.Y.2d at 438, 590 N.Y.S.2d 857, 605 N.E.2d 344 (citations omitted) (quoting *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) and *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)). The defendant must have acted with "reckless disregard" for the truth. *Liberman,* 80 N.Y.2d at 439, 590 N.Y.S.2d 857, 605 N.E.2d 344.

■ Satisfaction of the constitutional malice standard requires the plaintiff to prove far more than mere mistake or negligence on the part of the defendant. As the New York Court of Appeals has stated, "[t]here is a critical difference between not knowing whether something is true and being highly aware that it is probably false. Only the latter establishes reckless disregard in a defamation action." *Id.; see also Peters v. Baldwin Union Free Sch. Dist.,* 320 F.3d 164, 170 (2d Cir.2003) (applying this proposition and holding that the defendant-principal's failure to investigate the allegedly false content of the

---

8. Plaintiff's reliance on the qualified privilege principle as articulated in *Byam v. Collins,* 111 N.Y. 143, 19 N.E. 75 (1888), is misplaced. (Pl. Mem. Opp. Cross Mot. Summ. J. at 12–13.) *Byam* merely states, "The general rule is that in the case of a libelous publication the law implies malice, and infers some damage. What are called 'privileged communications' are exceptions to this rule." *Id.* at 150, 19 N.E. 75. Plaintiff, however, does not dispute the existence of a privilege with respect to credit reporting agencies such as defendant. Thus, *Byam* is inapposite because malice is not implied when the qualified privilege is applicable. Indeed, the New York Court of

Appeals and the Second Circuit consistently have held that when the privilege applies, the existence of malice is an element that the plaintiff must demonstrate as part of its prima facie case. *See Albert,* 239 F.3d at 266 (holding that non-existence of the privilege is an element of defamation); *Shamley,* 869 F.2d at 173 ("In order to overcome this privilege, employee-*plaintiffs must allege malice.*" (emphasis added)); *Liberman,* 80 N.Y.2d at 437, 590 N.Y.S.2d 857, 605 N.E.2d 344 ("The shield provided by the privilege may be dissolved *if plaintiff can demonstrate* that defendant spoke with malice." (emphasis added)).

plaintiff-guidance counselor's performance report before he sent it to the schools superintendent did not satisfy the actual malice standard).   Thus, " '[m]alice … means more than mere negligence or want of sound judgment…. It means more than hasty or mistaken action.' "   *A.B.C. Needlecraft*, 245 F.2d at 777 (omissions in original) (quoting *Pecue v. West*, 233 N.Y. 316, 322, 135 N.E. 515 (1922)).

Our review of the case law of New York demonstrates that under the constitutional malice standard, piercing the qualified privilege in the credit reporting context requires truly egregious and reckless conduct on the part of the credit reporter. Mistakes arising from ordinary negligence will not overcome the qualified privilege. For example, in *Rodrigues v. R.H. Macy & Co.*, 88 Misc.2d 985, 391 N.Y.S.2d 44 (1977), a consumer credit case, the plaintiff ordered a piece of furniture from the defendant.   *Id.* at 986, 391 N.Y.S.2d 44. There was a long delay in the delivery and, when the item was delivered, it did not conform to the plaintiff's specifications. *Id.* The plaintiff decided to return the furniture, resulting in another long delay before the defendant picked it up from the plaintiff's home.   *Id.* During this second delay, the defendant reported to a credit bureau that the plaintiff had a delinquent account, a report that was improper because the plaintiff should not have been charged for the furniture.   *Id.* During this same delay, the plaintiff, otherwise employed and financially responsible, had a credit card application denied.   *Id.* Thereafter, the plaintiff brought an action for slander and breach of contract.   *Id.* The court dismissed the slander claim and held that although the defendant "was guilty of negligence, bad management and poor customer relations," it was protected by the qualified privilege because "there was no evidence nor does it appear that this was done with malice or wilful intent to injure." *Id.* at 987, 391 N.Y.S.2d 44.

By contrast, *Nat'l Apparel Adjustment Council, Inc. v. Dun & Bradstreet, Inc.*, 42 A.D.2d 58, 345 N.Y.S.2d 40 (1st Dep't), *appeal denied*, 33 N.Y.2d 518, 305 N.E.2d 496, 350 N.Y.S.2d 1025 (1973), provides an illustration of the outlandish conduct on the part of a credit bureau that will create liability.   In this case, the Appellate Division affirmed the jury's verdict finding the defendant credit bureau liable for libel and slander when it "[c]oncededly … was out to get" the plaintiff and had contacted some of the plaintiff's creditors in contravention of its usual practices, which led the creditors to join in filing an involuntary bankruptcy petition.   *Id.* at 60, 345 N.Y.S.2d 40.   The defendant also passed along an unsubstantiated rumor that the plaintiff might be leaving the country.   *Id.* at 61, 345 N.Y.S.2d 40.   Moreover, "[e]ven while the dismissal of the involuntary petition was in progress, [the] defendant's employees kept spreading rumors of voluntary bankruptcy, and [the plaintiff's] principal factor froze his credits.   The end result, after an abortive attempt at chapter 11 reorganization to relieve pressure and untimely payment demands, was actual bankruptcy."   *Id.* The court concluded that the jury reasonably could have found that the defendant's behavior was "part of a common scheme or plan, deliberately and maliciously set on foot to injure [plaintiff's] business enterprises," and that if the defendant had acted with reckless disregard and not deliberately, it would be "at least as evil, particularly when indulged in by an agency enjoying defendant's reputation and position of trust, as deliberate malice."   *Id.*

Decisions in other states provide a similar illustration of the type of egregious conduct, transcending mere negligence, necessary to give rise to liability.   *Compare Dun & Bradstreet, Inc. v. Robinson*, 233 Ark. 168, 177–78, 345 S.W.2d 34

(1961) (holding that the defendant was not entitled to the protection of the qualified privilege because there was "substantial evidence" that it exhibited "conscious indifference and reckless disregard" toward the truth and the plaintiff-merchant's rights by publishing a report indicating that the plaintiff was about to file for bankruptcy based solely on a "misunderstood casual remark"), *overruled on other grounds by United Ins. Co. of Am. v. Murphy*, 331 Ark. 364, 961 S.W.2d 752 (1998), *with Dun & Bradstreet, Inc. v. O'Neil*, 456 S.W.2d 896, 900–01 (Tex.1970) (holding that the defendant credit reporting service was entitled to the protection of the qualified privilege when it erroneously and negligently reported without verifying that the plaintiff "Alvin *Truman* O'Neil" had filed for bankruptcy, rather than his brother "Alvin *Numan* O'Neil" (emphasis added)).

■ Defendant argues that plaintiff has not shown any evidence of malice on its part and that it is, therefore, entitled to summary judgment because it is protected by the qualified privilege. (Def. Mem. Supp. Cross Mot. Summ. J. at 8–9.) It contends that any error was the result of an honest mistake occasioned by the computer matching system's linking of CVL and CV & S that was caused by their very similar identifying information, and that there is therefore no showing of actionable malice because it had no awareness of the report's falsity. (*Id.*) In response, plaintiff contends that defendant "lies, misrepresents, and attempts to perpetrate a fraud upon this Court" and appears to argue

that defendant acted with reckless disregard for the truth because the report issued to Fleet in December 1998 and the January 1999 reinvestigation put defendant on notice as to the lack of any link between CVL and CV & S.[9] (Pl. Mem. Opp. Cross Mot. Summ. J. at 8–9.) Plaintiff also seems to argue that defendant's matching system is grossly flawed because there is no evidence of any procedures that ensure the accuracy of the computer-generated report when the computer must utilize conflicting or confusing data. (*Id.* at 11–12.) We conclude that the record reveals no evidence of malice on the part of defendant beyond plaintiff's bare and conclusory allegations, and defendant therefore remains entitled to the protection of the qualified privilege.

Plaintiff argues that defendant acted with reckless disregard for the truth because it had notice of the falsity of the 2001 report as a result of the "linkage" in the December 1998–January 1999 report and reinvestigation. (*Id.* at 8–9.) Our review of the record indicates that plaintiff has offered no evidence that the December 1998 report sent to Fleet *incorrectly* linked CVL and CV & S—put differently, plaintiff has offered no evidence to dispute defendant's contention that Fleet had requested information about both CVL and CV & S. Thus, the January 1999 credit report limited to CVL and omitting references to CV & S, issued along with the reinvestigation letter, *see supra* note 7, does not establish that defendant erred in responding to Fleet's December 1998 by furnishing reports on both businesses.[10]

---

**9.** We had considerable difficulty comprehending plaintiff's arguments as expressed in its several memoranda. Any misstatement of those arguments herein is the result of the lack of clarity in plaintiff's submissions, aggravated, *inter alia*, by plaintiff's lack of a discernible paragraph or sentence structure, and all-caps, single-spaced point headings, some of which are nearly one page long.

**10.** Plaintiff seems to argue that the January 1999 reinvestigation letter, *see supra* note 7, is an admission that the December 1998 report to Fleet was incorrect, and thus amounted to knowledge by defendant that there was no link between CVL and CV & S. Plaintiff asks hypothetically: "Why would the defendant send the same report on January 19, 1999 saying that after investigation … they sepa-

■ Moreover, even assuming without deciding that the Fleet incident did put defendant on notice of the distinction between CVL and CV & S, that incident was too remote temporally from the April 2001 report at issue here to render defendant's actions reckless. Cases arising in the analogous consumer credit reporting context under the Fair Credit Reporting Act ("FCRA") 15 U.S.C. § 1681 *et seq,*[11] are illustrative on this point. The FCRA allows an award of punitive damages for a credit bureau's willful noncompliance with § 1681e(b), which is the provision that requires credit bureaus to maintain "reasonable procedures to assure maximum possible accuracy." *See* 15 U.S.C. § 1681n. A credit bureau's actions committed without "evil motive," but in "conscious disregard for the rights of others" are considered "willful noncompliance" justifying the imposition of punitive damages under the FCRA. *See Cousin v. Trans Union Corp.,* 246 F.3d 359, 373–74 (5th Cir.2001); *Philbin v. Trans Union Corp.,* 101 F.3d 957, 970 (3d Cir.1996); *Casella v. Equifax Credit Info. Services,* 56 F.3d 469, 476 (2d Cir.1995), *cert. denied,* 517 U.S. 1150, 116 S.Ct. 1452, 134 L.Ed.2d 571 (1996).

Under this "willful noncompliance" standard, which echoes the constitutional malice standard linguistically, courts have held that the reappearance of erroneous material on a consumer's credit report, even after the consumer has notified the credit bureau of the error, may be evidence of negligence, but does not constitute conscious disregard justifying the imposition of punitive damages. Thus, in *Cousin,* the Fifth Circuit held that although the credit bureau had notice that a reported delinquency was the result of subscription fraud against the consumer, and previously had shielded the consumer's report from further entries based on the fraudulent account, the reinsertion of that false account information several months after the initial notice did not constitute willful noncompliance. 246 F.3d at 373–74. Indeed, the court also concluded that with respect to the consumer's state law defamation claim, these facts did not constitute legally sufficient evidence of malice by reckless disregard. Similarly, in *Philbin,* the Third Circuit concluded that a credit bureau's republication of erroneous information two years after it had been removed in response to a complaint by the consumer did not constitute evidence of willful noncompliance. 101 F.3d at 970. Accordingly, we conclude that even if the December 1998–January 1999 incident had been notice of the lack of linkage between CVL and CV & S, it does not create a triable issue of fact as to whether defendant acted with reckless regard for the truth in issuing the April 2001 credit report.

■ We similarly reject plaintiff's apparent argument that the lack of procedures and safeguards in the computer-matching system for ensuring complete accuracy when the computer must process conflicting or confusing data amounts to defendant's reckless disregard for the truth, or knowledge of the statements' probable falsity. (Pl. Mem. Opp. Cross Mot. Summ. J. at 11–12.) Indeed, the Seventh Circuit has held such matching

---

rated or corrected the report." (Pl. Mem. Opp. Cross Mot. Summ. J. at 8.) However, the language of the reinvestigation letter says nothing about separation or correction. *See supra* note 7.

11. We note, however, that the FCRA is inapplicable in this action because it is applicable only to consumer credit reporting, and not to commercial credit reporting. *See, e.g., Williams v. Equifax Credit Info. Services,* 892 F.Supp. 951, 953 (E.D.Mich.1995) (stating that the FCRA "was not enacted to protect consumers in procuring commercial credit, in that it only pertains to consumer credit.").

systems compliant as a matter of law under the "reasonable procedures to assure maximum possible accuracy" standard of the FCRA, 15 U.S.C. § 1681e(b). *See Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 663 (7th Cir.2001). Moreover, this "reasonable procedures" provision allows for the imposition of liability on credit bureaus based on mere negligence; it is, therefore, far less forgiving of credit agencies than is the constitutional malice standard. *See Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir.1994) (noting that credit agencies may be held liable for actual damages, costs and attorney's fees for negligent violation of § 1681e(b), and subject to punitive damages for wilful violations); *King v. MTA Bridges & Tunnels*, 933 F.Supp. 220, 225 (E.D.N.Y.1996) (stating that a plaintiff seeking to prove a violation of § 1681e(b) must demonstrate that "the consumer reporting agency was negligent in that it failed to follow reasonable procedures to assure the accuracy of its credit report," in addition to the reporting of inaccurate information, injury and causation).

*Crabill* is particularly illuminating. In that case, the plaintiff, a man named Jerry, had a brother named John, and their social security numbers differed only by one digit. 259 F.3d at 663. This resulted in the defendant credit bureau erroneously furnishing a credit report on John several times when one had been requested on Jerry. *Id.* "Denied credit several times, Jerry complained to Trans Union, which began adding at the end of its credit reports on Jerry the notation (in capital letters): 'do not confuse with brother John D. Crabill.'" *Id.* Nevertheless, Jerry's creditors continued to receive from the defen-

dant credit bureau unsolicited reports about John, although those reports did contain the cautionary notation. *Id.* This occurred because the credit bureau's computer "treated requests for a credit report on Jerry as requests for a credit report on John as well. If any of these creditors missed the notation and erroneously supposed that both reports pertained to Jerry, the mistake was the creditor's." *Id.* Some creditors, however, continued to decline credit to Jerry, which caused him to bring an action against the credit bureau. The Seventh Circuit concluded that "the statutory duty to maintain reasonable procedures to avoid inaccuracy does not require a credit agency to disregard the possibility that similar files refer to the same person." *Id.* In so holding, it accepted the credit bureau's argument that "two files with similar though not identical identifying data may actually be referring to the same person, the differences in data being the result of errors in data collection or compilation, and so it was useful for creditors to have both Crabills' files and make their own judgment of whether they were different persons." [12] *Id.*

In light of such cases applying a far less stringent reasonableness standard, we conclude that defendant's operation of its computer system did not amount to reckless disregard for the truth. Indeed, there is evidence in the record that a 100 percent matching requirement would be harmful because it would eliminate from consideration relevant credit information based on errata in the database. (Poteraj Aff. ¶¶ 4–5.) Furthermore, the April 2001 Bank of New York credit application submitted and signed by Lucchesi, the president of CVL

---

**12.** In *Crabill,* however, the Seventh Circuit ultimately concluded that there was a question of fact as to the reasonableness of the credit bureau's procedure because Jerry's complaint had given it notice of the confusing effect of the multiple reports, and the "ensem-

ble [of reports on John and Jerry] was potentially misleading." 259 F.3d at 664. The court also concluded, however, that Jerry had not proven that the reports caused him any compensable injuries. *Id.*

himself, and plaintiff's counsel, as CVL's vice-president named the business as "*County Van & Storage,*" not "County Vanlines," a misspelling that renders the terms searched even closer to "County Van & Storage." (Broderick Decl., Ex. L.) Thus, in the context of the credit defamation cases from New York and elsewhere, this case is far closer to the "Truman" and "Numan" confusion of *O'Neil,* 456 S.W.2d at 900–01, or "John" and "Jerry" in the FCRA case *Crabill,* 259 F.3d at 663, than it is to the grossly negligent conduct of the credit bureau in *Robinson* publishing a report of bankruptcy based only on casual gossip, 233 Ark. at 177–78, 345 S.W.2d 34, or the vindictive, scheming credit bureau in *Nat'l Apparel Adjustment Council,* 42 A.D.2d at 60–61, 345 N.Y.S.2d 40. Accordingly, we conclude that plaintiff has not introduced evidence of malice sufficient to pierce the protection afforded to defendant by the qualified privilege, and we dismiss plaintiff's commercial defamation claims in their entirety.[13]

## CONCLUSION

For all of the foregoing reasons, defendant's cross motion for summary judgment dismissing plaintiff's Complaint in its entirety is granted, and plaintiff's motion for partial summary judgment is denied as moot.

SO ORDERED.

**13.** Plaintiff, relying primarily on *State Farm Mut. Auto. Ins. Co. v. Bockhorst,* 453 F.2d 533 (10th Cir.1972), also argues that a company that utilizes a computer to assemble credit reports is held to a higher standard and cannot claim that an erroneous report is an "honest mistake." (Pl. Mem. Opp. Cross Mot. Summ. J. at 11–12.) We do not read *Bockhorst* as supporting plaintiff's argument in any way—indeed, to begin with, it is not a defamation case. In *Bockhorst,* an insurance company argued that an insured was not covered for an automobile accident because it had reissued a lapsed policy solely based on the operation of its computer system having processed a payment, and without knowledge of the insured's accident that had occurred shortly before the payment and reissuance. 453 F.2d at 535–36. The Tenth Circuit rejected that argument, and stated:

> Holding a company responsible for the actions of its computer does not exhibit a distaste for modern business practices as State Farm asserts. A computer operates only in accordance with the information and directions supplied by its human programmers. If the computer does not think

like a man, it is man's fault. The reinstatement of Bockhorst's policy was the direct result of the errors and oversights of State Farm's human agents and employees. The fact that the actual processing of the policy was carried out by an unimaginative mechanical device can have no effect on the company's responsibilities for those errors and oversights.

*Id.* at 536–37. Thus, in the present case, the computer-matching system merely is a tool that defendant uses in its work. Its use does not alter in any way the legal standards applicable to defendant, be they imposed by statute, common law or constitution. Indeed, in the present case, we follow the common sense-imposed lead of other courts considering credit defamation and FCRA claims, and focus our inquiry on the defendant's programming of the computer, and the quality of the data supplied by persons for entry into that computer system at various points in the credit investigation process. Thus, we reject as fundamentally unsound any contention that defendants who operate computers in their work cannot raise defenses of an "honest mistake" in their work.